# HELICOPTER LEASE AGREEMENT

Dated April 17, 2024

BETWEEN

**PHI AVIATION, LLC,**
*as Lessor*

and

**NEW YORK HELICOPTER CHARTER INC.,**
*as Lessee*

══════════════════════════════════

Lease of one (1) Bell model 407 Helicopter

Manufacturer's Serial No: 53114

Make and Model of Engine: Rolls-Royce Corporation model 250-C47B

══════════════════════════════════

_____



TABLE OF CONTENTS

1.    DEFINITIONS AND INTERPRETATION. ....................................................... 1

2.    REPRESENTATIONS AND WARRANTIES. ................................................. 7

3.    CONDITIONS. ................................................................................................. 10

4.    COMMENCEMENT. ....................................................................................... 12

5.    DISCLAIMERS. ............................................................................................... 13

6.    RENT AND OTHER PAYMENTS. ................................................................. 15

7.    FEES AND EXPENSES. .................................................................................. 16

8.    OBLIGATIONS OF LESSOR. ........................................................................ 18

9.    GENERAL UNDERTAKINGS. ....................................................................... 19

10.   OPERATIONAL UNDERTAKINGS. ............................................................. 20

11.   MAINTENANCE AND REPAIR. .................................................................... 24

12.   INSURANCES. ................................................................................................. 27

13.   DEFAULT. ........................................................................................................ 30

14.   PAYMENTS ON EVENT OF DEFAULT ....................................................... 34

15.   REDELIVERY. ................................................................................................. 35

16.   INDEMNITIES AND TAXES. ......................................................................... 36

17.   FURTHER PROVISIONS. ............................................................................... 38

i

**THIS HELICOPTER LEASE AGREEMENT** (this "**Lease**") is made and dated April 17, 2024 by and between:

**PHI AVIATION, LLC**, a limited liability company organized and existing under the laws of the State of Louisiana and having its principal office address at 2001 SE Evangeline Thruway, Lafayette, Louisiana ("**Lessor**"); and

**NEW YORK HELICOPTER CHARTER INC.,** a company organized and existing under the laws of New York and having its registered address at Pier 6 at East River, New York, NY 10006 ("**Lessee**").

**WHEREAS**:

(A)    Lessee wishes to lease the Helicopter from Lessor; and

(B)    Lessor has legal title to the Helicopter is willing to lease the Helicopter to Lessee subject to the terms and conditions herein.

**NOW THEREFORE IT IS AGREED** as follows:

**1.     DEFINITIONS AND INTERPRETATION.**

1.1    **Definitions**.  In this Lease the following words and expressions have, except where the context otherwise requires, the meanings set forth below:

"**Acceptance Certificate**" means a certificate substantially in the form set forth in Appendix 1.

"**Additional Insureds**" has the meaning set forth in Section 12.2(c).

"**Affiliate**" means, in respect of any Person, any Person directly or indirectly controlling, controlled by, or under common control with such first Person, and a Person shall be deemed to control another Person if such first Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, contract or otherwise.

"**Agreed Value**" means the Current Fair Market Value.

"**Aircraft Documents**" means all technical data, manuals, logs, records, computer data media and other materials and documents and other repositories of information in whatever form kept, or required to be kept, with respect to the Helicopter or any part thereof whether in compliance with any applicable Law, any regulation of the FAA, this Lease, or otherwise.

"**Aircraft Protocol**" means the Protocol to the Cape Town Convention on Matters Specific to Aircraft Equipment.

"**Airframe**" means the Helicopter (excluding the Engine) and all Parts installed therein or thereon the Airframe and all substituted, renewed and replacement Parts, at any particular time installed in or on the Airframe in accordance with the terms of this Lease, including Parts which have been removed from the Airframe, all of which shall remain the property of Lessor pursuant to this Lease.

1

"**Airworthiness Directive**" means an airworthiness directive or airworthiness notice issued by the FAA.

"**Approved Maintenance Provider**" means a Person (i) approved by the FAA to perform maintenance and repairs and service on and with respect to the Helicopter and (ii) approved by Lessor in writing.

"**Business Day**" means any day (other than Saturday or Sunday) on which banks are open for general business in Lafayette, Louisiana.

"**Cape Town Convention**" means collectively the official English language texts of the Convention on International Interests in Mobile Equipment, the Aircraft Protocol, and the regulations and procedures enacted by the Supervisory Authority of the International Registry thereunder.

"**Collateral Agent**" means any Person holding a Lien over the Helicopter, or over or in respect of this Lease, on behalf of the Finance Parties.

"**Compliance Date**" means the date on which Lessee has both (i) redelivered to Lessor the Helicopter, including the Aircraft Documents, in accordance with this Lease (or in the case of a Total Loss of the Helicopter, has paid the Agreed Value in accordance with this Lease) and (ii) paid all amounts and satisfied all obligations then due hereunder and under the Transaction Documents.

"**Current Fair Market Value**" means the current fair market value of the Helicopter as determined by Lessor in its reasonable discretion.

"**Cycle**" means a starting and stopping of an Engine.

"**Cycle Ratio**" has the meaning set forth in Appendix 4.

"**Default**" means an Event of Default or an event or a condition that, with the giving of notice, the lapse of time or the making of a determination or the satisfaction of any condition under the Transaction Documents or any combination of both, would be an Event of Default.

"**Delivery**" means the delivery of the Helicopter by Lessor to Lessee in accordance with the terms of this Lease.

"**Delivery Date**" means the date the Helicopter is delivered by Lessor to Lessee in accordance with the terms of this Lease.

"**Delivery Location**" means Lafayette, Louisiana or such other location agreed between Lessor and Lessee in writing.

"**Engine**" means (i) the Rolls-Royce Corporation model 250-C47B engine having the manufacturer's serial number set forth in the Acceptance Certificate and all Parts installed in or on such engine at Delivery, (ii) any replacement engine acquired by Lessor and leased to Lessee hereunder and all Parts, installed in or on such engine at the time of such acquisition and lease and (iii) all substituted, renewed and replacement Parts, at any particular time installed in or on any of the said engine in accordance with the terms of this Lease, including, in the case of (i) and (ii) above, any such engine which, having been removed from the Helicopter, remains the property of

2

Lessor pursuant to this Lease and, in the case of (i), (ii) and (iii) above, any Parts, which having been removed from any such engine, remain the property of Lessor pursuant to this Lease.

"**Event of Default**" means any of the events specified as such in Section 13.1.

"**Expiration Date**" means the latest to occur of (i) the Scheduled Expiration Date or (ii) if the Helicopter is not returned to Lessor on the applicable Redelivery Date in the condition required by the terms of this Lease, the earlier of (x) the date Lessee redelivers the Helicopter to Lessor in the condition required under Section 15 of this Lease and Lessor accepts such redelivery and (y) to the extent Section 15.4 of this Lease shall apply, the date Lessee shall reimburse Lessor and each Indemnitee in full for all costs and expenses incurred in connection with placing the Helicopter in the condition required under Section 15 of this Lease.

"**FAA**" means the Federal Aviation Administration of the Department of Transportation of the United States of America and any successor that under the Laws of the United States of America shall from time to time have control or supervision of civil aviation in the United States of America or have jurisdiction over the registration, airworthiness, or operation of, or other matters relating to, the Helicopter.

"**Finance Party**" means any financier of Lessor, any of its Affiliates, or any person in whose favor or for whose benefit security over the Helicopter has been granted at any time, and shall include any Collateral Agent and/or Person acting as agent or trustee for one or more Finance Parties.

"**Financing Documents**" means all Loan Leases, Security Documents, and all other documents executed from time to time by Lessor or any Affiliate thereof by way of security for, or as a guarantee of the performance by, Lessor or such Affiliate of its obligations under any Loan Lease (whether or not such document secures any other obligations as well).

"**Flight Hours**" means each hour or part hour, in each case, calculated to the nearest tenth of an hour, in accordance with the Manufacturer's defined guidelines for flight hour definition.

"**Flight Hour Deposit**" has the meaning set forth in Appendix 4.

"**Flight Hour Rate**" has the meaning set forth in Appendix 4.

"**Flight Hour Rate Payment**" means a payment to be made by Lessee to Lessor based on the Flight Hours accrued on the Helicopter each calendar month multiplied by the Flight Hour Rate.

"**Governmental Authority**" means and includes (whether having a distinct legal personality or not) (a) any national government, political subdivision thereof, or local jurisdiction therein, (b) any board, commission, department, division, organization, instrumentality, court or agency of any entity referred to in (a) above, however constituted, and (c) any association, organization or institution (international or otherwise) of which any entity mentioned in (a) or (b) above is a member or to whose jurisdiction any entity mentioned in (a) or (b) above is subject or in whose activities any such entity is a participant.

"**Helicopter**" means the Bell model 407 helicopter with manufacturer's serial number 53114 and includes the Airframe, the Engine, all Parts, and the Aircraft Documents.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

"**Indemnitee**" means Lessor and each Finance Party and their respective successors, permitted assigns and their respective officers, directors, managers, agents, contractors, shareholders, owner participants, partners, members, Affiliates, and employees.

"**Insurances**" means insurances and reinsurances in respect of the Helicopter described in and complying with the requirements of Section 12 (which requirements may be amended from time to time by Lessor).

"**Insurers**" means the insurers and reinsurers, if any, providing the Insurances.

"**International Registry**" means the international registry established pursuant to the Cape Town Convention.

"**Law**" means and includes (a) any statute, decree, constitution, regulation, rule, order, judgment, Airworthiness Directive, or other directives of any Governmental Authority; (b) any treaty, pact, compact or other agreement to which any Governmental Authority is a party; (c) any judicial or administrative interpretation or application of any Law described in (a) or (b) above; and (d) any amendment or revision of any of the foregoing.

"**Lease Term**" means the period commencing on the Delivery Date and ending on the Termination Date.

"**Lessor's Lien**" means any Lien on the Helicopter arising as a result of (a) any Claim against Lessor or any Affiliate of Lessor for which Lessee is not obligated to indemnify Lessor or such Affiliate, (b) any act of Lessor or any Affiliate of Lessor that is not related to the transactions contemplated by this Lease or the other Transaction Documents or is in violation of any of the express obligations of Lessor under this Lease or the other Transaction Documents, (c) Taxes (including claims therefor) imposed on Lessor or any Affiliate of Lessor for which Lessee is not obligated to indemnify Lessor or such Affiliate pursuant to the terms of this Lease or (d) any Lien in favor of a Finance Party.

"**Lien**" means any mortgage, charge, pledge, lien, assignment, assignment by way of security, right of detention, right of set-off, right of de-registration or export, statutory right *in rem*, international interest, national interest or any encumbrance or security interest whatsoever, howsoever created or arising.

"**Loan Lease**" means any agreement from time to time entered into between or among Lessor or any Affiliate thereof and one or more Finance Parties relating to the financing directly or indirectly of Lessor's or any Affiliate's acquisition, ownership or leasing of the Helicopter.

"**Loss**" means all and any liabilities, losses, claims, proceedings, damages, penalties, fines, fees, costs and expenses of whatsoever kind, type or nature howsoever arising, suffered, or incurred which at any time is suffered by any Party or is incurred or arises out of or in connection with this Lease and the Transaction Documents or Lessee's operations hereunder or Lessee's use of the Helicopter either directly or through its agents.

"**Maintenance Program**" means a maintenance program for the Helicopter approved by the FAA and approved in writing by Lessor, encompassing scheduled maintenance, condition monitored maintenance, and/or on-condition maintenance of Airframe, Engine or Parts, including storage, servicing, testing, preventive maintenance, repairs, structural inspections, system checks, overhauls, approved modifications, service bulletins, engineering orders, Airworthiness Directives,

4

corrosion control, inspections and treatments, which complies with applicable Law, and does not conflict with the Manufacturer recommendations.

"**Manufacturer**" means Bell in respect of the Airframe and Rolls-Royce Corporation in respect of the Engine.

"**Material Part**" has the meaning set forth in Appendix 4.

"**Overdue Rate**" has the meaning set forth in Appendix 4.

"**Part**" means each part, component, appliance, accessory, instrument, or other item of equipment (other than complete Engine or other engines) for the time being installed or incorporated in or attached to the Airframe or an Engine or which, having been removed therefrom, remains the property of Lessor pursuant to this Lease. Not in limitation of the foregoing, "Part" shall include all main and tail rotor blades and all main and tail rotor blade dynamic components associated therewith.

"**Permitted Lien**" means (i) the respective rights of Lessor and Lessee as provided in this Lease and the other Transaction Documents; (ii) any Lien in respect of Taxes which are either not yet assessed or, if assessed, not yet due and payable or are being contested in good faith by appropriate proceedings (and for the payment of which adequate reserves or an adequate bond have been provided by Lessee subject to, in the opinion of Lessor, there being no (x) likelihood of the Helicopter being seized, confiscated or sold as a result thereof or (y) material detriment to the rights of Lessor hereunder); (iii) any Lien of an airport hangar-keeper, mechanic, materialman, carrier, employee or other similar Lien arising in the ordinary course of business by statute or by operation of Law, in respect of obligations that are not overdue or that are being contested in good faith by appropriate proceedings and in the case of such proceedings so long as adequate cash reserves are maintained in respect of such amounts in accordance with relevant generally accepted accounting principles; and (iv) any Lessor's Lien; provided, however, that (in relation to subsections (ii) and (iii) above) any such proceedings, or the continued existence of such Lien, do not involve any likelihood of the sale, forfeiture or loss of the Helicopter or the Engine or Part or any interest therein.

"**Person**" means an individual, general partnership, corporation, business trust, joint stock company, trust, unincorporated association, joint venture, limited liability company or limited partnership, Governmental Authority, or any other entity of any nature.

"**Redelivery Certificate**" means a certificate substantially in the form set forth in Appendix 2.

"**Redelivery Date**" means the Expiration Date.

"**Rent**" means the Flight Hour Rate Payments, payable in accordance with Section 6.

"**Return Location**" means Lessor's facility in Lafayette, Louisiana or such other location in the continental United States as designated by Lessor.

"**Scheduled Delivery Date**" means June 17, 2024.

"**Scheduled Expiration Date**" means the date falling thirty-six (36) months after the Delivery Date.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

"**Security Deposit**" has the meaning set forth in Appendix 4.

"**Security Documents**" means any and all assignments by way of security or mortgage, or any similar agreement creating a Lien, entered into by Lessor or any Affiliate thereof or in respect of any or all of such Person's right, title and interest in the Helicopter, this Lease and/or the other Transaction Documents from time to time granted by such Person in favor of any Finance Party.

"**Sublease**" means any sublease agreement entered into in accordance with this Lease.

"**Sublease Assignment**" means a sublease assignment between Lessee, as assignor, and Lessor, as assignee, dated as of the Delivery Date or the date of the relevant Sublease, as the case may be, including all notices and acknowledgments contemplated thereby, in each case, in form and substance reasonably satisfactory to Lessor.

"**Sublessee**" means any sublessee consented to in accordance with the terms of this Lease.

"**Supplemental Rent**" means all amounts, liabilities, and obligations (other than Rent) which Lessee assumes or agrees to pay under this Lease or any other Transaction Document to Lessor or any Indemnitee, including any indemnity payments, Flight Hour Rate Payments, Flight Hour Deposit, Security Deposit, and Agreed Value.

"**Tax**" or "**Taxes**" means all present and future taxes, levies, imposts, duties, withholdings, fees or charges of any nature whatsoever, and wheresoever imposed, including value added tax, consumption tax or any other tax in respect of added value or any income (including gross income, minimum, alternative minimum, capital gains income, gross receipts and net receipts), franchise, transfer, sales, use, business, occupation, excise, personal property, real property, stamp or other tax imposed by a taxing authority, together with any penalties, additions to tax, fines or interest with respect to any of the foregoing; and "tax" and "taxation" shall be construed accordingly.

"**Termination Date**" means the Scheduled Expiration Date or if earlier, the date of termination of the leasing of the Helicopter hereunder pursuant to Section 13.2 or Section 10.6(d).

"**Total Loss**" means, in relation to the Helicopter, the Airframe or the Engine (i) its actual, constructive, compromised, arranged or agreed total loss (including any damage thereto or requisition for use or hire which results in an insurance settlement on the basis of a total loss), or (ii) its destruction or damage beyond economic repair (as determined by Lessor and an Insurer, each acting reasonably) or being rendered permanently unfit for normal use for any reason whatsoever, or (iii) its requisition, condemnation, confiscation, seizure, sequestration, detention, forfeiture or compulsory acquisition, or (iv) its requisition for use or hire, confiscation, seizure, detention, hijacking, theft or disappearance which deprives any Person permitted to have possession and/or use of the Helicopter, and a Total Loss of the Helicopter shall be deemed to have occurred if a Total Loss occurs with respect to the Airframe (whether or not the Engine is also a Total Loss).

"**Total Loss Payment Date**" shall have the meaning set forth in Section 12.4 of this Lease.

"**Total Rent**" means Rent and, as applicable, Supplemental Rent.

"**Transaction Documents**" means, either collectively or individually as the context requires, this Lease, any permitted Sublease, any Guaranty Lease, and all notices, consents, certificates, confirmations, agreements, security filings and other documents from time to time issued or entered

6

into by Lessee pursuant to or in connection with any documents referred to above or which Lessee acknowledges as a Transaction Document.

"**U.S. Dollars**," "**Dollars**," "**USD,**" or "**$**" means the lawful currency of the United States of America.

1.2    **Interpretation**.

(a)    <u>General</u>.  References to Sections and Appendices are to be construed as references to the sections and appendices of and to this Lease and references to this Lease include the Appendices.  Words importing the plural shall include the singular and vice versa.  The headings in this Lease are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.  References to (or to any specified provision of) this Lease or any Transaction Document or any other agreement shall mean this Lease or such Transaction Documents or such other agreement (or the relevant specified provision thereof) as in force for the time being and as amended, novated, substituted or supplemented from time to time in accordance with this Lease or such Transaction Document.

(b)    <u>Certain Definitions</u>.  References in this Lease to (i) the "Helicopter" include any part of the Helicopter, and, where the context so admits, any of the Aircraft Documents, and references to any part of the Helicopter include any part of the Engine, (ii) "including" and other terms of similar meaning means "including, without limitation," (iii) "international interest," "prospective international interest" or "national interest" mean such as defined or used in the Cape Town Convention, (iv) "month" are references to a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month (and references to "months" shall be construed accordingly) save that, where any such period would otherwise end on a day that is not a Business Day, it shall end on the preceding Business Day, and provided that if there is no numerically corresponding day in the month in which that period ends, that period shall end on the last Business Day in such month and (v)  references to any "Person" include any assignee or transferee of such Person as permitted in accordance with Section 17.1 of this Lease.

(c)    <u>Indemnities</u>.  Unless the contrary intention appears all indemnities under the Transaction Documents are independent of any other obligations under the Transaction Documents and continue in force notwithstanding the Termination Date or the Expiration Date.

2.    **REPRESENTATIONS AND WARRANTIES.**

2.1    **Lessee's Representations and Warranties**.  Lessee represents and warrants to Lessor as of the date hereof and as of the first day of each month as follows:

(a)    it is duly incorporated and is validly existing under the Laws of its state of formation and has full corporate power and authority to conduct its business as presently conducted, to own or hold under lease its assets, to enter into and perform its obligations under the Transaction Documents and to consummate the transactions contemplated hereby and thereby;

(b)    its organizational documents do not incorporate provisions that prohibit the entry into and performance by it of, and the transactions contemplated by the Transaction Documents, and all necessary corporate, shareholder and any other action of Lessee that are required to

7

authorize it to sign and deliver and perform its obligations under and the transactions contemplated by the Transaction Documents have been duly performed, and all necessary authorizations, approvals, consents, licenses, permits and orders of and registrations with any Governmental Authority that are required to authorize it to sign and deliver and perform its obligations under and the transactions contemplated by the Transaction Documents have been duly and unconditionally obtained and are now in full force and effect (or will be duly and unconditionally obtained and will be in full force and effect as provided under Section 3 hereof);

(c)     it has duly executed and delivered this Lease and the other Transaction Documents, and the Transaction Documents constitute, or when entered into will constitute, its legal, valid, and binding obligations, enforceable in accordance with their respective terms;

(d)     neither the execution and delivery of the Transaction Documents, nor the performance of any of the transactions contemplated herein and therein will:

 (i)     contravene or constitute a violation or breach of, or a default under any existing Law or agreement by which Lessee or any of its assets is bound, any agreement to which it is a party, or any of Lessee's organizational documents;

 (ii)     will require any shareholder approval or consent of any trustee or holders of any indebtedness of Lessee except such as have been duly obtained and which remain in full force and effect;

 (iii)     cause any limitation on Lessee or its assets or the powers of its directors or officers, whether imposed by or contained in Lessee's organizational documents or any existing Law, agreement or otherwise, to be exceeded; or

 (iv)     result in the creation or imposition of, or oblige Lessee to create, any Lien over the Helicopter or its interest in any Transaction Document subject to the rights of Lessor and the Lessee under this Lease;

(e)     except for (i) such filings, registrations and recordings as will have been obtained on the Delivery Date, (ii) filings of a routine nature for customs and air navigation purposes, (iii) as applicable, the filings as may be necessary or desirable under the Cape Town Convention, and (iv) disclosures required by Law, it is not necessary or advisable under the Laws of the United States of America in order to ensure the validity, effectiveness or enforceability of any Transaction Document or to protect the rights of Lessor and the Finance Parties, if any, in the Helicopter or any Part thereof that any Transaction Document or any other instrument be filed, registered or recorded, or that any stamp, registration or similar tax be paid in relation to Transaction Documents, or that any registration or other action be taken, and under such Laws, the rights of Lessor and the Finance Parties, if any, in the Helicopter will have priority in all respects over the claims of all creditors of Lessee;

(f)     its obligations under the Transaction Documents are, or upon execution thereof by Lessee will be, direct, general, and unconditional obligations of Lessee and rank, or will rank, at least pari passu with all other present and future unsecured and unsubordinated obligations (including contingent obligations) of Lessee save for obligations mandatorily preferred by Law and not by contract;

8

(g)     no event has occurred that constitutes a contravention of, or default under, any agreement by which Lessee or any of its assets is bound or affected that could reasonably be expected to have a material adverse effect on Lessee's financial condition, business, assets or operations or an adverse effect on its ability to observe or perform its obligations under the Transaction Documents;

(h)     no litigation, arbitration or administrative proceeding that could (by itself or together with any other such proceedings or claims) reasonably be expected to have a material adverse effect upon its financial condition, business, assets or operations, or an adverse effect on its ability to observe or perform its obligations under the Transaction Documents, or to result in the creation or imposition of, or oblige Lessee to create, any Lien over the Helicopter, is presently in progress or pending or threatened against Lessee or any of its assets;

(i)     it is solvent and able to pay its debts as the same fall due and the transactions contemplated by the Transaction Documents to which it is a party are of commercial benefit to it and in its commercial interests;

(j)     the financial statements, appraisals and other information provided by it to Lessor are accurate in all material respects and did not, as of the date of delivery of the same, contain any untrue statement or omit to state facts, the omission of which makes the statements therein misleading in any material respect or omit to disclose any material matter to Lessor;

(k)     it has duly filed all Tax returns that it is required by applicable Law to file and has duly paid all Taxes stated to be due and payable in such Tax returns and in any and all notices, assessments, demands for payment or other communications issued by any taxing authority, in each case other than (i) Taxes which Lessee is diligently contesting on a substantial legal basis, in good faith and in accordance with applicable Law, provided that such contest does not present any risk of the sale, forfeiture, confiscation, seizure or loss of the Helicopter or interest therein as a result of such contest and provided that Lessee maintains adequate reserves in accordance with relevant generally accepted accounting principles with respect to the Taxes being contested and (ii) Taxes the nonpayment of which do not (and could not reasonably be expected to), individually and in the aggregate, materially adversely affect its business or assets;

(l)     neither the Helicopter nor any Part thereof will constitute "property used predominantly outside the United States", "public utility property", or "tax-exempt use property" within the meaning of Sections 168(g)(10), 168(h) or 168(i) of the United States Tax Code;

(m)     neither Lessee nor any member of any group of corporations, limited liability companies, partnerships, or other organizations with which Lessee files consolidated, combined or unitary income or franchise tax returns will file any tax return or other document which is inconsistent with the treatment of Lessor as the owner of the Helicopter for income tax purposes;

(n)     no material adverse change in respect of Lessee's business, assets, property, financial condition, or operations has occurred since the date of the latest financial statement compilation of Lessee provided by Lessee to Lessor;

(o)     the Maintenance Program complies and will comply with all requirements of the FAA and respective Manufacturer requirements;

(p)     Lessee is a duly authorized and certificated aircraft operator (or the equivalent) in good standing under applicable Law, has complied with and satisfied all of the requirements of and is in good standing with the FAA, so as to enable it to fulfill its obligations under this Lease, and to otherwise lawfully operate, possess, use and maintain the Helicopter in accordance with this Lease; and has paid, or will pay when and if required under applicable Law, all customs duties, customs clearance fees, value added Taxes, special duties or any other Taxes, if any, imposed upon or arising in respect of the leasing of the Helicopter;

(q)     it, under applicable Law, is subject to private commercial Law and suit, and neither Lessee nor its properties or assets have any right of immunity from suit or execution on the grounds of sovereignty in any jurisdiction or on any other grounds;

(r)     this Lease and other Transaction Documents are in the proper form for their enforcement against Lessee in the jurisdiction of its incorporation;

(s)     no Default or Event of Default has occurred and is continuing;

(t)     Lessee has not granted to any Person other than Lessor an international interest, national interest, or prospective international interest with respect to the Airframe or the Engine;

(u)     Lessee is not situated for purposes of the Cape Town Convention in any jurisdiction other than its state of formation;

(v)     Lessee (and/or Sublessee, as the case may be) will register as a transacting user entity for the purposes of the Cape Town Convention if possible; and

(w)     the Helicopter constitutes "aircraft objects" (as defined in the Cape Town Convention).

2.2     **Representations and Warranties Repeated**.  The representations and warranties in Section 2.1 shall survive the execution of this Lease and Delivery.

2.3     **No Prejudice**.  The rights of either party hereto in relation to any misrepresentation or breach of warranty by the other party shall not be prejudiced by any investigation by or on behalf of the first party into the affairs of the other party, by the performance of this Lease and the other Transaction Documents to which it is a party or by any other act or thing done or omitted by the first party that would, but for this Section 2.3, prejudice such rights.

**3.      CONDITIONS.**

3.1     **Conditions Precedent**.  Lessor's obligation to deliver and commence the leasing of the Helicopter under this Lease is subject to fulfillment of each of the following conditions:

(a)     Lessor shall receive the following, each in form and substance reasonably satisfactory to Lessor, on or prior to the Delivery Date:

(i)     a certificate of a duly authorized officer or director of Lessee attaching (A) a certified true copy of resolutions of the board of directors (or other equivalent corporate authority) of the Lessee approving the transactions contemplated by this Lease and authorizing a person to sign and deliver on behalf of Lessee this Lease and the other Transaction Documents to which it is a party; (B) certified true copies of the current organizational documents of Lessee, all amendments thereto; (C)

10

specimen signatures, authenticated by an officer of Lessee; (D) a certified true copy of the most recent balance sheet of Lessee available as at the date of execution of this Lease; (E) certified true copies of Lessee's air transport license, air operator's certificate and all other licenses, certificates and permits required to be maintained by Lessee for the use and operation of the Helicopter and the transport of passengers and/or cargo by helicopter by the FAA;

(ii)    such legal opinions as Lessor may reasonably require in form and substance satisfactory to Lessor;

(iii)    a certified copy of the Maintenance Program;

(iv)    originals or certified copies of certificates evidencing the Insurances required to be maintained under this Lease;

(v)    any other documents reasonably required by Lessor with respect to (i) its "know your customer" requirements or (ii) the transactions contemplated by the Transaction Documents and with respect to Lessee or the Helicopter;

(vi)    evidence that all governmental and other licenses, approvals, consents, registrations and filings necessary for any matter or thing contemplated by this Lease have been obtained (which may be satisfied by a statement in a legal opinion from Lessee's legal counsel, satisfactory to Lessor, that no such licenses etc. are required) (or, in the case of effecting of any registrations and filings, that arrangements satisfactory to Lessor have been made for the effecting of the same within any applicable time limit); and

(vii)    such other documents as Lessor may reasonably require.

(b)    Lessor shall have received counterparts duly executed by Lessee of this Lease, the Acceptance Certificate, and the other Transaction Documents;

(c)    all of Lessor's fees, costs, and expenses (including legal fees) then due and owing to Lessor under this Lease or any Transaction Document shall have been paid in full;

(d)    Lessee shall have paid the Security Deposit and Flight Hour Deposit;

(e)    no Default or Event of Default shall have occurred and be continuing or would arise by reason of the occurrence of the transactions contemplated in Transaction Documents;

(f)    after the date of this Lease there shall not have occurred:

(i)    any change in any applicable Law or in the interpretation thereof that would make it unlawful for Lessor and/or Lessee to perform any of their respective obligations under this Lease or any of the other Transaction Documents; or

(ii)    a material impairment in the international aviation financial markets due to certain force majeure events, including without limitation, a major terrorist incident, an outbreak of armed hostilities or a global outbreak of communicable disease.

11

(g)   there shall have been no material adverse change in the financial condition, business, assets, or operations of Lessee; and

(h)   Lessee shall fix and maintain nameplates in a prominent position in the cockpit or cabin of the Helicopter stating:

"THIS AIRCRAFT IS OWNED BY PHI AVIATION, LLC"

3.2   **Satisfaction; Waiver**.  Lessee shall use commercially reasonable efforts to cause each of the conditions set forth in Section 3.1 to be satisfied promptly after the date hereof but in any event on or prior to the Scheduled Delivery Date.  The conditions precedent set forth in Section 3.1 are for the sole benefit of Lessor and may be waived or deferred by Lessor in whole or in part and with or without conditions.  If any of such conditions precedent are not satisfied on the Delivery Date, have not been waived by Lessor in writing, and Lessor nonetheless agrees to deliver the Helicopter to Lessee, Lessee shall ensure that such conditions precedent are satisfied within ten (10) calendar days of the Delivery Date and failure of Lessee to do so shall constitute an Event of Default.

3.3   **Conditions Subsequent.**

(a)   Within one (1) Business Day of the Delivery, Lessor's receipt from FAA counsel of priority search certificates evidencing international interest filings in favor of Lessor in respect of the Helicopter.

**4.    COMMENCEMENT.**

4.1   **Term of Leasing**.

(a)   General; Renewal.  Subject to the satisfaction of the conditions precedent set forth in Section 3 and Section 4.2, on the Scheduled Delivery Date or such other day and time as Lessor shall notify Lessee in writing, Lessor shall lease the Helicopter to Lessee and Lessee shall take delivery of the Helicopter on lease in accordance with this Lease for the duration of the Lease Term.

Lessee may request an extension of the Lease Term by providing a request in writing to Lessor at least 60 days in advance of the Scheduled Expiration Date.  Any renewal is contingent in all respects on Lessor conducting any due diligence it deems advisable (including review of Lessee's updated financial statements and other matters).  Lessor may approve, condition, or deny any extension request in its sole discretion.

(b)   Risk of Loss.  After Delivery, the Helicopter, including the Aircraft Documents, the Engine and every Part will be in every respect at the sole risk of Lessee, who will bear all risk of loss, theft, damage, or destruction thereto from any cause whatsoever.

4.2   **Delivery**.  The Helicopter shall be delivered to Lessee and Lessee shall lease the Helicopter "**AS IS, WHERE IS**" and with all faults and liabilities.  Lessor shall deliver the Helicopter to Lessee at the Delivery Location and at delivery Lessee shall execute the Acceptance Certificate attached hereto as Appendix 1. Lessee's execution of the Acceptance Certificate shall be regarded as Lessee's absolute, unconditional, and irrevocable acceptance of the Helicopter.

4.3   **Mobilization/Demobilization Expenses**. Lessee shall be responsible for all mobilization and demobilization expenses of any kind or nature to or from the Delivery Location, if any, including,

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

but not limited to, fees, any and all licenses, disassembly, crating, packaging, shipping, transport, insurance, legal and other expenses. In the event that Lessor elects to pay any of the costs associated with the responsibilities described above, such payments shall be reimbursed by Lessee in full within ten (10) Business Days of the invoice date.

4.4    **Lessee Acceptance of Helicopter**. If Lessee (x) fails to take delivery of the Helicopter when properly tendered for delivery by Lessor in the condition required under this Lease, or (y) repudiates its obligations under this Lease prior to the Delivery Date for such Helicopter (in each case other than by reason of the Helicopter suffering a Total Loss prior to Delivery or the failure of Lessor to perform its obligations under this Lease (other than where such Total Loss or such failure is caused due to the failure of the Lessee to perform its obligations under the Transaction Documents)), Lessee will be liable for and shall indemnify Lessor and the Finance Parties from and against (on a full indemnity basis, and on the basis of invoices accompanied by substantiating documents confirming the respective costs and expenses), and pay to Lessor on demand an amount equal to:

(a)    all direct costs and expenses incurred by Lessor or the Finance Parties as a result thereof;

(b)    all fees, costs, and expenses (including legal, professional, and out-of-pocket expenses and other costs but without duplication of any other amounts paid under this Section 4.4) payable or incurred by Lessor or the Finance Parties in connection with such failure or repudiation or the enforcement of, or preservation of any of Lessor's or the Finance Parties' rights under this Lease or any Transaction Document; and

(c)    any losses suffered by Lessor or the Finance Parties as a result of such failure or repudiation or the enforcement of any of Lessor's or Finance Parties' rights under this Lease, including, in each case, lost Rent payments during any period in which the Helicopter is placed in storage (and taking into account any expenses incurred by Lessor in modifying or reconfiguring the Helicopter to meet the requirements of an alternative lessee). The foregoing shall not be deemed to limit the damages provided for elsewhere in this Lease.

## 5.    DISCLAIMERS.

5.1    **General Disclaimers and Waivers**.

LESSEE ACKNOWLEDGES AND AGREES THAT LESSEE ALONE HAS SELECTED THE HELICOPTER FOR LEASING BY LESSOR TO LESSEE.

LESSEE UNCONDITIONALLY AGREES THAT (A) THE HELICOPTER AND EACH PART THEREOF IS TO BE DELIVERED AND LEASED BY LESSOR TO LESSEE IN AN "AS IS, WHERE IS" AND "WITH ALL FAULTS AND LIABILITIES" CONDITION AS AT THE DELIVERY DATE AND THROUGHOUT THE LEASE TERM AND (B) NO TERM, CONDITION, WARRANTY, REPRESENTATION OR COVENANT OF ANY KIND HAS BEEN MADE OR IS GIVEN BY LESSOR OR ANY FINANCE PARTY OR ANY OF THEIR RESPECTIVE AFFILIATES, SERVANTS OR AGENTS OR ANY OTHER INDEMNITEE IN RESPECT OF THE AIRWORTHINESS, VALUE, QUALITY, DURABILITY, CONDITION, DESIGN, OPERATION, DESCRIPTION, MERCHANTABILITY, SATISFACTORY QUALITY OR FITNESS FOR USE OR PURPOSE, TITLE TO OR INTEREST IN THE HELICOPTER OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT, INHERENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), OR AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, COPYRIGHT, DESIGN, OR OTHER PROPRIETARY RIGHT.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

UNDER NO CIRCUMSTANCES SHALL LESSOR OR ANY INDEMNITEE BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR PUNITIVE DAMAGES AND LESSEE HEREBY WAIVES ALL WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND ON THE PART OF LESSOR WITH RESPECT TO THE HELICOPTER AND ANY AND ALL GUARANTEES, OBLIGATIONS, LIABILITIES, RIGHTS AND REMEDIES WITH RESPECT THERETO, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OF MERCHANTABILITY, ANY IMPLIED WARRANTY ARISING FROM THE COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, ANY IMPLIED WARRANTY OF FITNESS AND ANY OBLIGATION OR LIABILITY ARISING FROM NEGLIGENCE, OR LOSS OF USE, REVENUE OR PROFIT OR FOR INCIDENTAL, CONSEQUENTIAL OR PUNITIVE DAMAGES.

LESSEE CONFIRMS THAT IT IS FULLY AWARE OF THE PROVISIONS OF THIS CLAUSE 5.1 AND ACKNOWLEDGES THAT RENT, SUPPLEMENTAL RENT AND ALL OTHER AMOUNTS PAYABLE BY LESSEE UNDER THIS AGREEMENT HAVE BEEN CALCULATED NOTWITHSTANDING THE PROVISIONS OF THIS CLAUSE 5.1.

NEITHER LESSOR NOR ANY INDEMNITEE SHALL BE LIABLE FOR, AND LESSEE HEREBY AGREES TO INDEMNIFY AND HOLD HARMLESS LESSOR AND EACH INDEMNITEE (ON A FULL INDEMNITY BASIS) FOR ANY LOSS, CLAIM, SUIT, JUDGMENT, OR DAMAGE (INCLUDING, WITHOUT LIMITATION, CONSEQUENTIAL OR INCIDENTAL DAMAGES) OR EXPENSE (INCLUDING ATTORNEYS FEES AND DEFENSE COSTS) ARISING OUT OF THE USE, OPERATION OR MAINTENANCE OF THE HELICOPTER BY LESSEE INCLUDING, WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF VALUE, LOSS OF USE OR LOSS OF PROFITS, OR ANY DAMAGE TO THE HELICOPTER OR ANY OTHER PERSON OR ENTITY, UPON THE THEORIES OF NEGLIGENCE, STRICT LIABILITY IN TORT, OR OTHERWISE.

5.2     **Deficiencies, Losses, and Delays**. Lessee agrees that neither Lessor nor any Finance Party shall be liable for:

(a)     any liability, claim, proceeding, loss, damage, fee, cost, or expense of any kind caused directly or indirectly by, or associated with, the Helicopter or any part thereof;

(b)     any inadequacy of the Helicopter or any part thereof for any purpose or any deficiency or defect therein or loss thereof;

(c)     the use or performance of the Helicopter or any part thereof;

(d)     any maintenance, repairs, replacement or modification to the Helicopter or any part thereof;

(e)     any interruption or loss of service or use of the Helicopter or any part thereof;

(f)     any impediments or limitations in the use of the Helicopter from any cause whatsoever, including but not limited to, and whether as, a consequence of any Governmental Authority or foreign legislation, the orders, regulations, or decrees of any Governmental Authority or other regulatory body, lack of spare parts, rationing, trade union measures, the misuse or negligence of Lessee in its operation of the Helicopter, any damage caused to the Helicopter or accidents involving Lessee's use of the Helicopter, or for any other reason

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

and such impediments or limitations shall not entitle Lessee to any compensation whatsoever or a reduction of payments due hereunder; or

(g)     any loss of business, consequential damages, or any theory of liability for any special, indirect, punitive, or consequential damages or any damage whatsoever relating to any of the above matters.

## 6.     RENT AND OTHER PAYMENTS.

6.1     **Rent Generally**.  Lessee shall make each Rent payment regardless of the operational status of the Helicopter.

6.2     **Flight Hour Rate Payments; Maximum Cycles per Flight Hour**.

(a)     Lessee shall provide records to Lessor within five (5) days after the end of each calendar month ("Reporting Deadline") showing the Flight Hours and Airframe and Engine Cycles accrued during the month. If Lessee is late providing the records to Lessor, Lessee shall pay Lessor an additional Two Hundred Fifty Dollars ($250.00 USD) per calendar day past the Reporting Deadline until Lessor receives the applicable records. Upon receipt of the records, Lessor will deduct from the Flight Hour Deposit the Flight Hour Rate Payment (in full and without any deduction or withholding in respect of set-off, counterclaim, duties, taxes, or other charges) each month, and Lessor will provide an invoice to Lessee for the same amount.  Lessee must pay the Flight Hour Rate Payment to replenish the Flight Hour Deposit within 15 days of Lessee's receipt of the applicable invoice, <u>provided that</u> in the event that the Flight Hour Rate Payment for any month exceeds the Flight Hour Deposit, then any amounts in excess of the Flight Hour Deposit shall become immediately due and payable by Lessee to Lessor. Lessee acknowledges and agrees to accrue at least the Annual Flight Hour Minimum each year of the Lease Term, and if the actual Flight Hours accrued for any year of the Lease Term are less than the Annual Flight Hour Minimum, then Lessor shall provide an invoice to Lessee in the amount of the difference between actual accrued Flight Hours and the Annual Flight Hour Minimum multiplied by the Flight Hour Rate, and Lessee must pay Lessor such amount within 15 days of Lessee's receipt of such invoice.

(b)     The Cycles accrued on the Engine during the Lease Term may not exceed the Cycle Ratio during the Lease Term.

6.3     **Payment Obligations Unconditional.**  This Lease is a net lease and Lessee's obligation to pay Total Rent shall be absolute and unconditional irrespective of any contingency whatsoever including but not limited to:

(a)     any right of set-off, counterclaim, recoupment, defense, withholding or other right Lessee may have against Lessor or any other Person;

(b)     any unavailability of the Helicopter for any reason (including a requisition thereof) or any prohibition or interruption of or other restriction against Lessee's use, operation, or possession of the Helicopter;

(c)     any insolvency, bankruptcy, reorganization, arrangement, readjustment of debt, dissolution, liquidation, or similar proceedings by or against Lessor, Lessee, or any other Person;

15

(d)    any invalidity or unenforceability or lack of due authorization of, or other defect in, this Lease or any of the other Transaction Documents;

(e)    any other cause that, but for this provision, would or might have the effect of terminating, discharging or in any way affecting any obligation of Lessee hereunder; or

(f)    any other reason whatsoever.

To the extent permitted by applicable Law, Lessee waives any and all rights and remedies conferred upon a lessee, including any rights of a lessee (i) to cancel or repudiate this Lease or any document relating thereto, (ii) to reject or revoke acceptance of the Helicopter or any component thereof or (iii) to recover from Lessor any general, special, incidental, punitive or consequential damages, for any reason whatsoever.

6.4    **Currency of Payments**.  All payments hereunder shall be made in the currency specified herein in immediately available funds to Lessor's account set forth in Section 6.7 hereof.

6.5    **Authorizations for Payments**.    Lessee shall obtain or procure that there are obtained all certificates, licenses, permits and other authorizations that are from time to time required for the making of the payments required by this Lease and any other Transaction Document on the date and in the amounts and currency that are required herein and therein, and shall maintain the same or procure that the same is maintained in full force and effect for so long as the same shall be required.

6.6    **Set-off and Suspension of Payments**. At any time after the occurrence of an Event of Default and as long as the same is continuing, Lessor may set off any matured obligation owed by Lessee under this Lease against any obligation (whether or not matured) owed by Lessor to Lessee, regardless of the place of payment or currency.  If an obligation is unascertained or unliquidated, Lessor may in good faith estimate that obligation and set off in respect of the estimated amount, in which case when the obligation is ascertained or liquidated, Lessor or Lessee may make a payment to the other (as appropriate) in respect of any amount by which the ascertained or liquidated amount differs from the estimated amount.  Lessor will not be obliged to pay any amounts to Lessee under this Lease so long as any sums which are then due from Lessee to Lessor or any other Indemnitee under this Lease or any other Transaction Document remain unpaid or any Default or Event of Default is continuing, and any such amounts which would otherwise be due will fall due only if and when Lessee has paid all such sums and cured to Lessor's satisfaction all such Defaults or Events of Default, as the case may be.

6.7    **Lessor's Account; Receipt of Payment**. All payments by Lessee under this Lease shall be made to account set forth in Appendix 4 or such other account as Lessor shall notify the Lessee in writing. If any due date is not a Business Day, such payment shall be due on the preceding Business Day.

## 7.    FEES AND EXPENSES.

7.1    **Security Deposit**.

(a)    On or before the Delivery Date, Lessee shall pay the Security Deposit to Lessor.  The Security Deposit may, at Lessor's option, be commingled with other Lessor funds.  Any interest earned on the Security Deposit will accrue for the account of Lessor.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

(b)    At Lessor's option, the Security Deposit may be applied to any sums which may be owed by Lessee under this Lease or any Other Lease Agreements at any time.  If so applied, Lessee shall immediately, upon written demand therefor, pay to Lessor in cash an amount equal to the amount so applied.

(c)    Provided no Default or Event of Default has occurred and is continuing under this Lease or any Other Lease Agreement, and except as otherwise set forth in the last sentence of Section 7.1(a) hereof, the Security Deposit shall be paid over to Lessee after the Termination Date and the satisfaction by Lessee, in full, of its obligations under this Lease. In addition, prior to the Delivery Date, to the extent the Helicopter is not delivered to Lessee for reasons attributable to Lessor or other reasons attributable to the delivery of the Helicopter, and not as a result of any action or omission of Lessee, Lessee shall return any pre-paid Security Deposit to Lessee.

(d)    Lessee acknowledges and agrees that, to the extent permitted under applicable Law, the Security Deposit is and shall be the sole and absolute property of Lessor and Lessee shall have no rights in any of the Security Deposit other than as set forth in Section 7.1(c).

7.2    **Flight Hour Deposit**.

(a)    On or before the Delivery Date, Lessee shall pay the Flight Hour Deposit to Lessor.  The Flight Hour Deposit may, at Lessor's option, be commingled with other Lessor funds.  Any interest earned on the Flight Hour Deposit will accrue for the account of Lessor.

(b)    The Flight Hour Deposit shall be applied and replenished pursuant to Section 6.2(a).

(c)    Provided no Default or Event of Default has occurred and is continuing under this Lease or any Other Lease Agreement, and except as otherwise set forth in the last sentence of Section 7.2(a) hereof, the Flight Hour Deposit shall be paid over to Lessee after the Termination Date and the satisfaction by Lessee, in full, of its obligations under this Lease. In addition, prior to the Delivery Date, to the extent the Helicopter is not delivered to Lessee for reasons attributable to Lessor or other reasons attributable to the delivery of the Helicopter, and not as a result of any action or omission of Lessee, Lessee shall return any pre-paid Flight Hour Deposit to Lessee.

(d)    Lessee acknowledges and agrees that, to the extent permitted under applicable Law, the Flight Hour Deposit is and shall be the sole and absolute property of Lessor and Lessee shall have no rights in any of the Flight Hour Deposit other than as set forth in Section 7(c).

7.3    **Reimbursable Fees and Expenses.**  Lessee shall pay and/or reimburse Lessor promptly upon demand (and on the basis of invoices accompanied by substantiating documents confirming the respective costs and expenses):

(a)    all reasonable accounting and legal fees, costs and expenses incurred by or on behalf of Lessor at any time in connection with this Lease and the other Transaction Documents, whether or not the Helicopter is delivered hereunder, including in connection with the negotiation, preparation, completion, execution and, where relevant, registration of this Lease and the other Transaction Documents, including closing costs in the amount of the Up Front Closing Costs;

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

(b)    all due diligence costs and expenses reasonably incurred by or on behalf of Lessor at any time in connection with the Transaction, including in connection with any appraisals of the Helicopter, and travel and lodging of Lessor personnel or agents;

(c)    all reasonable fees, costs, and expenses of Lessor or for which Lessor is responsible associated with perfecting this Lease or any other Transaction Document or Security Document, as the case may be, including, the provision of translations, registrations, notarizations or legalizations, and the making of such filings as may be necessary under the Cape Town Convention to protect and perfect the interests of Lessor and the Finance Parties in respect of the Helicopter;

(d)    all stamp, documentary, registration, or other like Taxes imposed on or in connection with the Transaction Documents other than any such Taxes which arise solely as a result of and in connection with any assignment or transfer of rights and/or obligations under the Transaction Documents by Lessor;

(e)    all tariffs, duties and fees, and government penalties, including without limitation, sales, use, excise, value-added, withholding, stamp, excise, business, and property taxes, imposed by any governmental entity in connection with this Lease or the use or operation of the Helicopter under this Lease (other than income taxes of Lessor);

(f)    all reasonable fees, costs, and expenses (including legal, professional, inspection and out of pocket expenses and other costs) payable or incurred by Lessor in connection with, any amendment, waiver, consent, or rescheduling (or preparations for any of these) requested by it or by or on behalf of the Lessee, or allowed by or required to implement the Transaction Documents; and

(g)    all reasonable fees, costs, and expenses (including legal, professional, inspection and out of pocket expenses and other costs) payable or incurred by in connection with the enforcement of or preservation of any of Lessor's or any Finance Party's rights under this Lease or in respect of any repossession of the Helicopter.

7.4    **Lessee's Expenses**.  All undertakings, covenants, and agreements of Lessee hereunder and under the other Transaction Documents shall be performed at Lessee's sole cost and expense except where this Lease expressly provides otherwise.

## 8.    OBLIGATIONS OF LESSOR.

8.1    **Quiet Enjoyment**. Lessor warrants that during the Lease Term, so long as no Event of Default has occurred and is continuing, Lessor shall not disturb Lessee's possession and use of the Helicopter in accordance with the terms of this Lease unless required in order to comply with applicable Law or a ruling of any court having jurisdiction over the Helicopter, Lessor, and Lessee.  Any purported breach of this warranty shall not give rise to any abatement or right to set-off against, recoup from or deduct any amounts from any Rent, or any other amount due and owing to Lessor under a Transaction Document, and Lessor shall not be deemed to have modified in any respect the obligations of Lessee under this Lease, which obligations are and shall remain absolute, irrevocable and unconditional under all events and circumstances whatsoever.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

9. **GENERAL UNDERTAKINGS.**

9.1 **Duration**. Lessee shall at all times during the Lease Term and until the Compliance Date perform and comply with all of its undertakings, covenants and agreements in this Lease and shall procure that no Person will act in any manner inconsistent with Lessee's obligations hereunder.

9.2 **Notice of Default and Confirmations**.

(a) Notice. Lessee shall immediately notify Lessor in writing if Lessee becomes aware of the occurrence of a Default or an Event of Default and of any other event or circumstance that might have a material adverse effect on its financial condition, business operations, assets or prospects or a material adverse effect on its ability to perform any of its obligations under any Transaction Document, taking into account all other obligations that Lessee must observe or perform at that time, and shall provide Lessor with the full details of any steps that Lessee is taking, or proposes to take, to remedy or mitigate the effect of such Default or Event of Default or other event or circumstance.

(b) Lessor Confirmations. Lessee shall, upon written request by Lessor, provide to Lessor an unqualified and unrestricted confirmation as to whether a Default or an Event of Default or such other event or circumstance as is referred to in this Section 9.2 has then occurred or is then subsisting.

9.3 **Financial and Other Information**.

(a) Annual Financials. In the absence of any other agreement or arrangement in writing between Lessor and Lessee, Lessee shall deliver to Lessor promptly after the same are available (and in any event within 150 days) after the end of each of its financial years, a copy of its audited financial statements for such financial year, which shall:

(i) be prepared in accordance with generally accepted accounting principles and practices consistently applied;

(ii) fairly and accurately present the financial position of Lessee as at the date as of which they were prepared and the results of the operations of Lessee for the period to which they relate; and

(iii) disclose all significant liabilities, actual or contingent, of Lessee.

(b) Other Financial Information. Lessee shall promptly provide Lessor with such financial, operational, and other information concerning Lessee and its parent companies and its affairs as Lessor may from time-to-time reasonably request in the context of the Transaction Documents and the transactions contemplated thereby, other than such information which is deemed confidential by virtue of Law or a contract to which Lessee is a party.

9.4 **Anti-Bribery Law Compliance**. Lessor and Lessee shall each, to the extent applicable to them:

(a) Comply with all applicable laws, statutes and regulations relating to anti-bribery and anti-corruption including, but not limited to, the United States Foreign Corrupt Practices Act of 1977, as amended; and

19

(b)    Have and maintain in place throughout the term of this Lease its own policies and procedures to ensure compliance with the requirements of the United States Foreign Corrupt Practices Act of 1977, as amended, and shall provide copies of such policies and procedures to the other party upon request.

9.5    **Other Covenants**. Lessee shall:

(a)    not permit the Helicopter to be seized in whatever manner, shall immediately notify Lessor in the event of such seizure and shall procure the immediate release of the Helicopter upon any such seizure;

(b)    continue to operate its business as currently conducted as a private helicopter operator and in the ordinary course;

(c)    not at any time represent or hold out Lessor, Owner or any other Financing Party as carrying goods or passengers on the Helicopter or as being in any way connected or associated with any operation or carriage (whether for hire or reward or gratuitously) which may be undertaken by Lessee:

## 10.    OPERATIONAL UNDERTAKINGS.

10.1    **Registration, Title, and Nameplates**.

(a)    <u>Registration</u>.  The Helicopter is registered with the FAA in the name of Lessor and will remain so registered, with Lessor's interest in the Helicopter and the Lien of any Security Document, and any Collateral Agent's interest in the Helicopter noted.

(b)    <u>Preservation of Rights</u>.  Lessee shall not do or permit to be done anything that would jeopardize the rights of Lessor or any Finance Party under any Transaction Document or Security Document in and to the Helicopter, the Insurances or any other collateral relating hereto or thereto and shall cause to be taken all actions necessary or reasonably requested by Lessor to prevent the rights of Lessor and each Finance Party in the Helicopter from being jeopardized. Lessee shall not do or permit to be done anything which, or omit to do anything the omission of which, would or would be likely to prejudice any material right that Lessor or any Finance Party may have against the Manufacturer, any maintenance provider or any supplier or manufacturer of the Helicopter or the Engine or any Part thereof. At the request of Lessor, Lessee will do all acts and things (including making any filing, registration or recording with the FAA, the International Registry or any other Governmental Authority or as required to comply with any applicable Law) and execute, notarize, file, register and record all documents as may be required by Lessor or any Finance Party to establish, maintain, perfect, protect and preserve the rights and interests of Lessor or any Finance Party hereunder and in the Helicopter and the rights and interests of any Finance Party under any Security Document as such Security Documents relate to the Helicopter or this Lease.  At the request of Lessor or any Finance Party, Lessee shall furnish an opinion of counsel or other evidence satisfactory to Lessor or any Finance Party of each such filing, recordation, and act.

(c)    <u>Nameplates</u>.  Lessee shall maintain and shall not cover up (or permit to be covered up), the nameplates referred to in Section 3.1(h).

20

(d)  <u>Title to Helicopter</u>.  Subject to Section 17.1, at all times during the Lease Term, full legal title to the Helicopter shall remain vested in Lessor to the exclusion of Lessee, notwithstanding the delivery of the Helicopter to, and the possession and use thereof by, Lessee.  This Lease transfers to Lessee with respect to the Helicopter a leasing interest only and Lessor is the owner and Lessor is the lessor of the Helicopter, and Lessee is the lessee of the Helicopter, for all purposes, including for purposes of the application of all relevant Laws and financial accounting principles.

(e)  <u>Lessor Operation of Helicopter</u>.  Lessee shall not at any time represent or hold out Lessor or any Finance Party as carrying goods or passengers on the Helicopter or as being in any way connected or associated with any operation of carriage (whether for hire or reward, or gratuitously) that may be undertaken by Lessee.

(f)  <u>Lessor Credit</u>.  Lessee has no authority to pledge, and shall not pledge, the credit of Lessor or any Finance Party for any fees, costs or expenses connected with any maintenance, overhaul, repairs, replacements, or modifications to the Helicopter or any part thereof or otherwise connected with the use or operation of the Helicopter or any part thereof.

(g)  <u>Cape Town Convention Filings</u>. Lessee shall, at Lessee's cost, comply with the Cape Town Convention, including maintaining an account as a transacting user entity on the International Registry, and shall make such filings as Lessor may determine necessary or desirable thereunder to protect and perfect the interests of Lessor and the Finance Parties in respect of the Helicopter.

10.2  **Liens**.  Lessee (i) shall not create or permit to arise or subsist any Lien (other than Permitted Liens) over the Helicopter or any part thereof or over any rights, revenues or proceeds derived from the Helicopter or any part thereof, (ii) shall not register, consent to any registration or permit any Person claiming through Lessee to register on the International Registry any interest in the Airframe, the Engine or this Lease and (iii) shall not attempt or hold itself out as having any power to sell, charge, lease or otherwise dispose of or encumber the Helicopter or the Engine or any Part other than as permitted under this Lease. Lessee will promptly, at its own expense, take all such action as may be necessary to discharge or satisfy (by bonding or otherwise) any Lien that is not a Permitted Lien if the same shall arise at any time.  Other than as expressly provided herein, Lessee shall not file any filings (including any corrective, amendment, or termination filings) or financing statements relating to the Helicopter or the interests created hereby, without Lessor's prior written consent. Lessee also agrees to take any action Lessor or any Finance Party, in their sole and absolute discretion, determines may be appropriate to protect Lessor's or any Finance Party's interest in the Helicopter and to make any and all filings and recordings, in whatever places or locations as Lessor or any Finance Party may request, in its sole and absolute discretion.

10.3  **Possession of Helicopter, Engine and Parts**.  Lessee shall not sublease, pool, interchange or otherwise part with possession of the Helicopter or the Engine or any Part except as set forth in this Section 10.3.

(a)  <u>Sublease</u>.  Lessee shall not sublease, sublet, charter, pool, interchange or otherwise allow any third party to operate or possess the Helicopter, the Engine, or any Part thereof without the prior written consent of Lessor in each instance.  Any sublease to which Lessor in its sole exercise of discretion may consent shall be expressly subject and subordinate to this Lease and shall be subject to Lessee entering into a sublease agreement with Sublessee and any other documents requested by Lessor, all in form and substance satisfactory to Lessor in its sole discretion).

21

(b)    <u>Lessee Obligations</u>.  Lessee shall cause the Airframe and the Engine or Part, whether or not installed on the Airframe, to be operated, available for inspection, maintained and insured as required under this Lease and the other Transaction Documents.

10.4    **Information and Records**.

(a)    <u>Operation and Maintenance</u>.  Lessee shall promptly furnish to Lessor or any Finance Party, as the case may be, all such information, documentation, certification, and other instruments, as Lessor or any Finance Party, as the case may be, may from time-to-time reasonably request regarding the Helicopter or any part thereof, its use, registration, location, airworthiness, insurance, maintenance, and condition.

(b)    <u>Aircraft Documents</u>.  Lessee shall keep, or procure that there are kept, the Aircraft Documents in the condition required for the immediate redelivery hereunder and shall keep as part thereof (i) accurate, complete and current records of all flights made by the Helicopter, of all flight hours of the Airframe, Engine and the Parts, all maintenance, modifications and repairs carried out on the Helicopter and Engine and every Part, the location of Engine and Part not installed on the Airframe and (ii) an up-to-date airworthiness directive status list, service bulletin incorporation list, rotable controlled, hard time and life limit components listings, modification list and structural repair file in respect of the Helicopter.  The Aircraft Documents shall be kept and maintained in English and in such manner, form and location as the FAA requires.  Except as required by applicable Law, the Aircraft Documents shall be the property of Lessor.  Lessee shall keep copies of the Aircraft Documents and shall ensure that such copies are stored and backed-up in accordance with the regulations of the FAA, or if such regulations do not exist, with the normal practices of air transport operators of international reputation.

(c)    <u>Loss or Damage</u>.  Lessee shall promptly on becoming aware of the same notify Lessor of any:

(i)    Total Loss with respect to the Helicopter, the Airframe, the Engine, or the Aircraft Documents;

(ii)    loss, damage or destruction to the Helicopter, any Part thereof, or the Aircraft Documents;

(iii)    theft, arrest, hijacking, confiscation, seizure, requisition, impound, taking in execution, detention or forfeiture of the Helicopter, any Part thereof, or the Aircraft Documents; and

(iv)    event, accident, or incident in respect of the Helicopter.

10.5    **Operation**.

(a)    <u>Compliance with Laws</u>.  Lessee shall comply and procure compliance with all applicable Laws, including without limitation, any rules, regulations, codes, or directives (including Airworthiness Directives) administered or promulgated by (i) the FAA and (ii) the manufacturers of the Helicopter and the Engine, Parts and components, in each case which may then be applicable to (x) the Helicopter (including Laws mandating insurance coverage), or (y) the use, maintenance and operation of the Helicopter as an operator or owner thereof, and will procure that the Helicopter is not used for any illegal purpose or

22

any illegal manner or for the carriage of any item or substance whose possession or carriage is illegal under any applicable Law.  Lessee shall obtain and maintain, in full force all certificates, licenses, permits and authorizations from time to time required for the use and operation of the Helicopter and for the making of payments required by and the performance of its obligations under this Lease and the other Transaction Documents, or shall procure that same are obtained and maintained.  All pilots and other crewmembers shall be trained and fully certified by the FAA, including annual recurrency training when necessary, and will also have all minimum flight hour and experience requirements as may be mandated by the Insurances covering the Helicopter.  Lessee agrees that it shall, or shall procure, that the Helicopter is operated and serviced in full accordance with the highest international standards of safety, prudence, and skill for commercial operators of aircraft.

(b)     Manufacturer Recommendations.  Lessee shall not use or permit the use of the Helicopter in any manner contrary to any recommendation of the manufacturers of the Helicopter, the Engine or any Part, or any recommendation or regulation of the FAA or for any purpose for which the Helicopter is not designed or reasonably suitable.

(c)     Commercial Flights.  Lessee shall use the Helicopter and procure that the Helicopter (i) shall be used at all times during the Lease Term, subject to maintenance requirements, in normal, commercial operations and (ii) shall not be discriminated against in its use or operation compared to similar helicopters owned or operated by Lessee.  Lessee shall not permit the Helicopter to be used for the carriage of any goods, materials, livestock, or items of cargo which could reasonably be expected to cause damage to the Helicopter, or which would not be adequately covered by the Insurances required hereby.  Without the written consent of Lessor in each instance, Lessee shall not use or permit the use of the Helicopter for purposes of training, qualifying, or reconfirming the status of cockpit personnel except for the benefit of Lessee's cockpit personnel, and then only if the use of the Helicopter for such purpose is not disproportionate to the use for such purpose of other helicopters of the same type operated by Lessee.

(d)     Insurance.  Lessee shall not use, operate, or locate the Helicopter or permit the Helicopter to be used, operated, or located in any manner not covered by the Insurances required hereby or in any area excluded from coverage by such Insurances or in any manner which would prejudice the interests of the Indemnitee or any Additional Insured in such Insurances, the Helicopter, the Engine, or any Part.

(e)     Location of Operations.  Lessee shall ensure that the Helicopter is at all times based in and operated from and within the continental United States of America.  With the exception of the return and demobilization to the Return Location, if applicable, Lessee shall not move, or permit the movement of, the Helicopter out of the continental United States of America without Lessor's prior written consent, and under no circumstances whatsoever shall Lessee cause or permit the Helicopter to proceed to, operate in or out of, or remain at, or go over or into (i) any location which is then the subject of a prohibition order (or any similar order or directive) or sanctions or restrictions by or under any Governmental Authority having jurisdiction over Lessor, any Finance Party or the Helicopter, (ii) any country or jurisdiction that does not maintain full diplomatic relations with the United States of America, (iii) any area of war or hostilities, (iv) any geographic area which is not covered by the Insurances, or (v) any country or jurisdiction for which exports or transactions are subject to specific restrictions under any law or directive of the United States of America.

23

(f)    <u>Hangar</u>.  The Helicopter shall be hangared at such location(s) as Lessee may designate with Lessor's consent in each instance, which consent shall not be unreasonably withheld, and such hangar locations shall not be changed without notification to Lessor, and Lessor's consent in each instance, which shall not be unreasonably withheld; <u>provided</u>, <u>however</u>, that such hangar location must at all times be located in the continental United States of America.

10.6    **Right of Inspection**.

(a)    Lessee shall, at its sole cost and expense, procure that Lessor and each Finance Party or their appraisers (or the authorized representative of any of the foregoing), as the case may be, at any time, may inspect the Helicopter and the Aircraft Documents or any part thereof to ascertain the condition thereof and satisfy itself that the Helicopter is being properly repaired and maintained in accordance with the terms of this Lease during which inspection Lessee shall, upon request, provide Lessor or the Finance Party with photocopies of the Aircraft Documents; <u>provided</u>, <u>however</u>, that so long as no Event of Default shall have occurred and be continuing, such inspection shall (i) not interfere with the normal commercial operations of the Helicopter and (ii) the Lessor or Finance Party shall have given Lessee reasonable notice thereof, it being acknowledged by Lessee that at least seven (7) calendar days' notice shall be reasonable under any circumstance.

(b)    After receiving any notice of any damage to the Helicopter, Lessor and any Finance Party shall be entitled to inspect, and to have their agents and technical representatives inspect, at the Lessee's sole cost and expense, the Helicopter and any components thereof in the event of any repairs resulting from the accident or event, and be on-site during the process of completing such repairs.

(c)    Lessee shall, at its sole cost and expense, provide all reasonable and necessary local transportation for Lessor's and any Finance Party's inspectors to travel to the location of the Helicopter in connection with any inspection hereunder during the Lease Term.

(d)    Lessee shall immediately remedy any and all faults or discrepancies found during such inspections at its sole cost and expense.  If any faults or discrepancies have not been resolved to Lessor's reasonable satisfaction within thirty (30) calendar days after Lessee's receipt of written notice from Lessor (or, if such default is not capable of being remedied within thirty (30) calendar days, Lessee shall have commenced the remedy within thirty (30) calendar days and thereafter diligently pursued the remedy to its completion), Lessor may terminate this Lease, and Lessee shall be required, at Lessee's sole cost and expense, to immediately return the Helicopter to Lessor in the condition required at redelivery at Lessor's designated location.

## 11.    MAINTENANCE AND REPAIR.

11.1    **General**.

(a)    <u>Airworthy</u>.  Lessee shall keep the Helicopter or procure that the Helicopter is kept airworthy in all respects and in good repair and condition (fair wear and tear excepted) and maintain or procure maintenance of a current certificate of airworthiness for the Helicopter (in the appropriate category for the nature of the operations of the Helicopter) and, if required by applicable Law, a certification as to maintenance for the Helicopter issued by or on behalf of the FAA.

24

(b)    <u>Damage</u>.  Lessee shall be responsible for any damage to the Helicopter, the Engine and any Part and component due to any reason whatsoever.

(c)    <u>Maintenance</u>.  Lessee shall keep Lessor's maintenance staff up to date and advised at all times regarding the Helicopter and its airworthiness and serviceability status, and shall immediately advise Lessor of any anomalies, damage, accidents, and events involving the Helicopter at any time, including but not limited to overtorques, overtemps, or blade strikes of any kind.  All maintenance, repair and servicing shall be conducted by an Approved Maintenance Provider and in strict accordance with all manufacturer's manuals, flight and maintenance manuals, current manufacturer recommendations, applicable overhaul manuals, service bulletins, Lessee's maintenance and operations specifications, FAA regulations and rules or other applicable regulations; <u>provided</u>, <u>however</u>, in the event of any potential conflict between the aforementioned items, Lessee's maintenance and operations specifications shall govern and apply.  It shall be Lessee's sole responsibility, at Lessee's cost, to obtain all OEM and other manuals necessary for the satisfactory operation and maintenance of the Helicopter at all times and to ensure that all applicable manuals are kept current, updated, and revised as necessary, and at all times.  Lessor shall be entitled to all originals, as well as all manual revisions and updates at the termination or expiration of this Lease.

(d)    <u>Modifications</u>.  No alterations, modifications, or accessories may be made to, or installed upon, the Helicopter without Lessor's consent in each instance, which consent will not be unreasonably withheld or conditioned by Lessor, and if consent is so given any alterations, modifications, or accessories added or done to the Helicopter shall immediately become the property of Lessor and will be returned with the Helicopter unless Lessor agrees in writing to the contrary, provided further that any modifications, alterations or accessories that are done for Lessee's specific mission requirements may be removed by Lessee from the Helicopter provided that removal will not damage the Helicopter in any way, result in any diminution in value of the Helicopter, or otherwise affect its airworthiness status, and further provided that any software upgrades or avionics modifications, alterations or improvements may not be removed from the Helicopter for any reason.

(e)    <u>No Discrimination</u>.  Lessee shall not discriminate against the Helicopter in the maintenance or modification of the Helicopter compared to similar helicopters owned or operated by Lessee, and Lessee shall service, repair, maintain and overhaul the Helicopter so as to keep the Helicopter maintained in the same manner and with the same care as used by Lessee with similar aircraft owned or operated by Lessee.

(f)    <u>Flight Data Monitoring System</u>.  Lessee shall not remove, alter, disable, or tamper with any flight data monitoring and aircraft management system installed on or in the Helicopter. Lessor shall have access at all times to any flight data monitoring and aircraft management system, and Lessee will cooperate with Lessor to the extent requested by Lessor as necessary to ensure such access. Lessee will provide Lessor the name, e-mail address, and phone number of one Lessee representative to be given access to the Spidertracks (or similar) system.

## 11.2    **Replacement and Removal of Engine, Parts, or Components**.

(a)    <u>Generally</u>.  Except as otherwise provided in this Section 11.2, Lessee shall, subject to the maintenance requirements and modification rights of this Lease, cause the Engine and all Parts to remain installed on the Helicopter.

25

(b)    <u>General Replacement</u>.  Lessee will be responsible for removing, repairing, overhauling, or replacing the Engine, Parts and components that need to be removed, repaired, overhauled or replaced as a result of (i) premature failure or mechanical difficulty including, but not limited to, accidents, incidents, hot starts, overtorques, overtemps, or overspeeds which occur during the Lease Term; or (ii) the Engine, Part or component reaching its applicable service life limit (except with respect to Material Parts, which are addressed separately in subpart (c) below).  If the Engine, any Parts or component of the Helicopter are replaced by Lessee for any reason set forth in (i), above, they must be replaced with a serviceable and airworthy Engine, Part, or component of at least the same quality and manufacturer as the Engine, Part, or component which was removed, with, if applicable, equivalent or less accrued service time hours or units.  The replacement of an Engine, Part, or component as a result of it reaching its applicable service life limit, including the replacement of any "on-condition" Parts or components, shall be done with a new or freshly overhauled Engine, Parts, or components.  Lessee shall bear all labor costs and shipping costs incurred for replacing the Engine, all Parts, and components, as well as for any other maintenance or inspections which are necessary at any time.

(c)    <u>Replacement of a Material Part</u>.  If and to the extent a Material Part needs to be removed, repaired, or overhauled as a result of reaching its normal service life limit, Lessee shall notify Lessor in writing at least 100 Flight Hours or two (2) months in advance of the anticipated removal, repair, or overhaul (e.g., in advance of the service life limit or overhaul life remaining) of the Material Part to enable Lessor to provide the replacement Material Part to Lessee, or to procure an overhaul or repair of the Material Part at issue; provided that Lessor will in no event provide any such replacement if the replacement is due to Lessee's improper use of the Helicopter (to include any operation contrary to any Manufacturer recommendation or manual) or damage in excess of normal wear and tear, or if Lessee is in Default of this Lease. Lessor's obligation is to replace or repair/overhaul of the Material Part only, labor costs or removal/installation or troubleshooting will be Lessee's sole responsibility.  No later than fourteen (14) days following receipt of such Material Part provided to Lessee by Lessor in relation to this sub-clause(c), Lessee shall return the Material Part or component being removed, repaired or overhauled to Lessor. All packaging, crating, and shipping costs and other expenses (including export/import fees, filings, and expenses, if any) shall be for Lessee's account and at Lessee's expense, and risk of loss during shipment shall be with Lessee at all times.  Lessor shall determine whether the value of a Part qualifies as a Material Part shall be determined by Lessor, acting reasonably.

(d)    <u>Early Removal</u>.  If Lessee replaces the Engine, Part or component in accordance with Section 11.2(b) and the Engine, Part or component is removed from service with more than one hundred (100) hours or one hundred (100) Cycles remaining, whichever is the lesser, or one (1) month prior to its applicable service life limit, unless the removal of the Engine, Part or component is specifically requested or authorized in writing either by Lessor or the FAA, Lessor shall invoice Lessee for an amount equal to the overhaul or service life limit cost per hour, Cycle, or month, whichever is applicable, multiplied by the number of hours, Cycles, or months which exceeds one hundred (100) hours, one hundred (100) Cycles or one (1) month, whichever is applicable.

(e)    <u>Title to Removed Parts</u>.  The Engine or any Part at any time removed from the Airframe or the Engine shall remain the property of Lessor and subject to this Lease and the Security Documents, no matter where located, until such time as such Engine or Part shall be replaced by an Engine or Part that has been incorporated or installed in or attached to such

26

Airframe or Engine, as applicable, and that meets the requirements for replacement Engine or Parts set forth above and until title to such replacement Engine or Part shall have passed to Lessor, according to applicable Law, or until the replacement Engine or Part is itself replaced by a replacement Engine or Part which thereupon becomes the property of Lessor (whereupon title to the replaced Part shall vest in Lessee free and clear of all Lessor's Liens (other than the replaced Engine or Material Part that is required to be sent back to Lessor pursuant to Section 11.2(c), which shall, for the avoidance of doubt, remain the property of Lessor)).

## 12. INSURANCES.

12.1 **Obligation to Insure**. Lessee shall, at its own expense, procure that the Insurances are maintained in full force and effect with respect to the Helicopter at all times during the Lease Term and until redelivery of the Helicopter to Lessor in form and substance acceptable to Lessor.

12.2 **Lessor's Insurance Requirements**.

(a) Lessee shall maintain in respect of the Helicopter (i) aircraft third party liability insurance and aircraft passenger liability insurance covering property damage and bodily injury, public liability and product liability, in amounts not less than a combined single limit of Fifteen Million U.S. Dollars ($15,000,000.00 USD) for any one occurrence and in the aggregate in respect of product liability and including war risks and allied perils, hijacking (air piracy), related perils coverages and confiscation, nationalization and expropriation coverages in accordance with the extended Coverage Endorsements (AVN52E or its successors) in amounts not less than Fifteen Million U.S. Dollars ($15,000,000.00 USD) for any single occurrence and in the aggregate in respect of product liability, (ii) all–risk aircraft hull and engine insurance (including foreign object damage insurance) in an amount which is not less than Two Million U.S. Dollars ($2,000,000.00 USD), (iii) hull war risk insurance and allied perils as per Lloyd's form LSW555C or LSW555D or the market standard wording as applicable if such forms are no longer applicable in amounts not less than Two Million U.S. Dollars ($2,000,000.00 USD) in respect of loss of or damage to the Helicopter, and (iv) with respect to any ocean transport of the Helicopter, marine insurance in an amount which is not less than the Agreed Value for the Helicopter. The deductibles under the foregoing policies shall not be in excess of deductibles standard for other operators with operations of a size, type, and scope similar to those of the Lessee.

(b) Lessee shall also maintain: (i) workers' compensation insurance in applicable statutory limits but at least in a minimum amount of $1,000,000.00 USD; (ii) employer's liability insurance in a minimum amount of $1,000,000.00 USD; (iii) commercial general liability, including bodily injury liability and property damage liability with minimum limits of $2,000,000.00 USD per occurrence; (iv) vehicle liability, including airside liability, owned and non-owned or hired and unlicensed vehicles, with a minimum of $1,000,000.00 USD per occurrence combined single limit for vehicles owned, operated, rented to, borrowed or leased by Lessee; and (iv) pollution and environmental hazard insurance in customary and standard amounts as found reasonably necessary by Lessor.

(c) All Insurances shall be primary and be in a form and substance and with insurers reasonably satisfactory to Lessor and all Insurances except those set forth in Section 12.2(b) shall name Lessor, such Finance Parties as Lessor may designate, and their respective officers, directors, agents, employees, shareholders, subsidiaries, Affiliates (and such subsidiaries' and affiliate's officers, directors, agents, shareholders and employees, contractors,

27

successors, assigns and all other Indemnitees and assigns (the "**Additional Insureds**") as additional insureds, with no deductible to such additional insureds, and with Lessor (or, if Lessor notifies Lessee in writing, the Collateral Agent) named as sole loss payee in respect of the Insurances carried in accordance with Sections 12.2(a)(ii) and (iii) above.

(d)    All Insurances (except those set forth in Section 12.2(b) above) shall:

(i)    contain a waiver of subrogation endorsement and breach of warranty coverage (on both the hull and liability coverages), and shall provide for at least thirty (30) days prior written notice to Lessor before cancellation or adverse material change in any policy (or at least seven (7) days or otherwise customarily available to the maximum in respect of war and allied perils insurance);

(ii)    insure the Additional Insureds and each of them regardless of any act or omission or breach or violation by Lessee or any other Person of any warranties, declarations, or conditions in such policies;

(iii)    waive any right of set-off against Lessee other than in respect of unpaid premiums;

(iv)    if deemed necessary by Lessor, operate on a world-wide basis;

(v)    include acceptance by the insurers of the contractual obligations of Lessee as set forth in this Lease to the extent of the policy coverage; and

(vi)    in respect of any reinsurance, if applicable, shall:

(A)    contain a "cut-through" clause in a form satisfactory to Lessor;

(B) provide for payment to be made even if the insurers which issue the primary Insurances are solvent or bankrupt, have been liquidated or dissolved or have not made a payment under the relevant original Insurance policy; and

(C)    be on the same terms as the primary insurance.

(e)    The liability insurance shall include a severability of interest clause providing that such policy shall operate in the same manner as if there were a separate policy covering each insured and shall not be subject to any offset by any other insurance carried by Lessor or Lessee.

(f)    The Insurances shall incorporate the terms and conditions of Airline Finance/Lease Contract Endorsement AVN67B ("**AVN67B**") or any subsequent successor thereto.  To the extent any provision of AVN67B conflicts or is otherwise inconsistent with the insurance requirements under this Lease, then (so long as it shall be general industry practice to insure helicopters that are financed or leased on the basis of AVN67B) such conflicting or inconsistent provisions of AVN67B shall prevail and shall be deemed to satisfy the insurance requirements under this Lease.

(g)    Any expenses of adjusting or collecting insurance proceeds shall be borne by Lessee. Lessor may subject to the terms of AVN67B, at its option, apply proceeds of Insurances in

whole or in part to repair or replace the Helicopter, the Engine, or any part thereof or after an Event of Default to satisfy any obligation of Lessee to Lessor hereunder.

12.3    **Insurance Covenants**.  Lessee shall:

(a)    ensure that all applicable requirements relating to the insurance of the Helicopter which are from time to time imposed by Laws of any country to, from or over which the Helicopter may be flown are complied with;

(b)    ensure that the terms and conditions of the Insurances are complied with and shall not do or agree to any act or omission which:

(i)    invalidates or may invalidate the Insurances;

(ii)    renders or may render void or voidable the whole or any part of any of the Insurances; or

(iii)    brings any particular liability within the scope of an exclusion or exception to the Insurances;

(c)    on request provide Lessor or the Finance Parties, as the case may be, with:

(i)    evidence that the insurance premiums have been paid in accordance with the terms of the relevant insurance policy; and

(ii)    any other insurance related information or assistance in respect of the Insurances that Lessor or the Finance Parties, as the case may be, may reasonably require;

(d)    be responsible for any deductible under the Insurances;

(e)    on or before the Delivery Date, Lessee shall provide Lessor with evidence satisfactory to Lessor (including a letter of undertaking addressed by Lessee's insurance broker in form and substance satisfactory to Lessor or such other evidence satisfactory to Lessor) that the Insurances are in full force and effect and will continue in full force and effect after the Delivery Date for the balance of the policy year; and

(f)    annually on the anniversary of the Insurances renewal date, Lessee shall furnish to Lessor and the Finance Parties, if any, a report describing in reasonable detail the insurance then carried and maintained on the Helicopter and certifying that such insurance complies with the terms of this Lease.

12.4    **Total Loss**.  On the earlier of the date (the "**Total Loss Payment Date**") that is (i) thirty (30) days from the date of a Total Loss and (ii) one Business Day after Lessor's final receipt of any insurance proceeds relating to the Total Loss, Lessee shall pay to Lessor Total Rent then due, plus the Agreed Value (if not already paid), together with interest at the Overdue Rate for the period from the Total Loss Payment Date through the date of payment.  For the avoidance of doubt, Lessee shall continue to pay Total Rent from the date of any Total Loss to the Total Loss Payment Date.  Upon making such payment of all Rent due and owing, Lessee's obligation to pay further Rent for the Helicopter subsequent to such payment shall cease, but Lessee's obligation to pay Supplemental Rent as well as any other amounts due under this Lease or any Transaction Document, if any, shall remain unchanged.

29

12.5    **Failure to Insure**.

(a)    If Lessee fails to procure that the Insurances are maintained as required by this Lease, Lessor or any Finance Party may:

(i)    at any time while that failure is continuing, require the Helicopter to remain at, or to proceed to and remain at, any location designated by Lessor until the failure is remedied or change addressed to its satisfaction;

(ii)    pay the premiums due or effect and maintain insurances satisfactory to it; and

(iii)    otherwise remedy that failure in any manner that it considers appropriate (including, without limitation, by effecting an "owner's interest" policy),

in each case without prejudice to its right to treat such failure as an Event of Default.

(b)    Lessee shall immediately reimburse Lessor or any Finance Party, as applicable, for any amounts paid by Lessor or any Finance Party, as the case may be, under paragraph (a) above, together with interest at the Overdue Rate from the date of payment through the date of reimbursement.

## 13.    DEFAULT.

13.1    **Classes of Events**.  Lessor may declare Lessee in default, and may, in its sole discretion, retake possession of the Helicopter or exercise or recover any and all other rights and remedies, upon the occurrence of any of the following, each of which shall constitute an Event of Default:

(a)    a failure of Lessee to pay any Rent, Supplemental Rent, Security Deposit, Agreed Value, or any other amount due under any of Transaction Documents in full as and when due or, in the case of amounts payable on demand, which failure continues for ten (10) days after written notice from Lessor or a Finance Party;

(b)    Lessee's failure to perform or breach of any other material provision of this Lease or any of the Transaction Documents and failure to cure the breach within fifteen (15) days after written notice from Lessor or a Finance Party;

(c)    any Transaction Document ceases to be a valid and enforceable agreement and in full force and effect for any reason other than the acts or omissions of Lessor;

(d)    an event of default (howsoever described) has occurred and is continuing under any other agreement between Lessor or one of its Affiliates, and Lessee or one of its Affiliates, as the case may be;

(e)    Lessee seeks, consents to or otherwise acquiesces in or joins in an application for the appointment of or taking possession by a custodian, receiver, trustee, examiner or liquidator of itself or any of its property, or Lessee admits in writing its inability to pay its debts generally as they come due or makes a general assignment for the benefit of its creditors, or Lessee files a voluntary petition in bankruptcy or a voluntary petition or an answer seeking reorganization, liquidation or other relief as debtor under any bankruptcy laws or insolvency laws (as in effect at such time), or an answer admitting the material allegations of or consenting to or otherwise acquiescing in or joining in a petition filed

30

against it in any such case, or the Lessee seeks relief as debtor by voluntary petition, answer or consent under the provision of any other bankruptcy or similar law providing for the reorganization or winding-up of corporations (as in effect at such time), or the Lessee seeks an agreement, composition, extension or adjustment with its creditors under such laws;

(f) (i) An order, judgment or decree is entered by any court of competent jurisdiction appointing, without Lessee's consent, a custodian, receiver, trustee, examiner or liquidator (or similar official) of Lessee of any of its property, is sequestered, or any other relief in respect of Lessee as a debtor is granted under any bankruptcy law or other insolvency laws (as in effect at such time); or (ii) a petition against Lessee in a proceeding under any bankruptcy laws or other insolvency laws (as in effect at such time) is filed and not withdrawn or dismissed within sixty (60) days thereafter, or petitioning creditors for any such involuntary petition are solicited (or caused to be solicited) by an affiliate or shareholder of Lessee;

(g) Lessee fails to take delivery of the Helicopter under this Lease or Lessee shall fail to execute the Acceptance Certificate within two (2) days following tender of the Helicopter by Lessor for delivery, for any reason other than an Event of Default by Lessor that has occurred and is continuing at the time;

(h) Lessee's failure to operate or maintain, or procure the operation and maintenance of, the Helicopter in accordance with the terms and conditions of this Lease if such failure is not resolved to Lessor's or a Finance Party's (as appropriate) reasonable satisfaction within thirty (30) calendar days after Lessee's receipt of written notice from Lessor or a Finance Party (or, if such failure is not capable of being remedied within thirty (30) calendar days, Lessee shall have commenced the remedy, or shall procure that the remedy has been commenced, within thirty (30) calendar days and thereafter diligently pursued the remedy to its completion);

(i) Lessee fails to maintain or cause to be maintained the Insurance required by Section 12, or a notice of cancellation is given in respect of any such Insurance and the same is not renewed or replaced in satisfaction of the requirement of Section 12 at least five (5) Business Days prior to (other than as a result of willful termination on the part of Lessor) such cancellation, or the Helicopter is operated at a time or in a place where any Insurance required by Section 12 shall not be in effect;

(j) any representation, warranty or statement made or deemed to be made by Lessee in connection with any of Transaction Documents or in any certificate, written statement or notice provided by Lessee to Lessor or any Finance Party under or in connection with any of Transaction Documents is or proves to have been incorrect when made and such breach is incapable of being remedied or, if capable of being remedied, is not remedied to Lessor's or a Finance Party's (as appropriate) satisfaction within thirty (30) days;

(k) if any consent, authorization, license, or approval necessary to enable Lessee to operate the Helicopter in accordance with the terms of this Lease or to enable Lessor to repossess the Helicopter or any part thereof upon termination of the leasing of the Helicopter hereunder, is materially and adversely modified or is not granted or is revoked, suspended, withdrawn, terminated or expires and is not renewed within thirty (30) calendar days;

(l) Lessee shall dissolve or otherwise cease to operate or continue doing business;

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

(m)     Lessee voluntarily suspends substantially all of its operations, or the permits, rights or privileges required for the conduct of its business and operations are revoked, cancelled, limited in any material fashion, or otherwise terminated or the free and continued use and exercise thereof limited in any material fashion, curtailed, or prevented;

(n)     Lessee purports to sell or dispose of the Helicopter, the Engine, or any Part thereof; or

(o)     The Helicopter is arrested, confiscated, seized, taken in execution, impounded, forfeited, or detained.

13.2    **Lessor's Rights**.

(a)     <u>Remedies</u>.  Upon the occurrence of any Event of Default, and in addition to any other rights and remedies which Lessor may have at Law or in equity or under this Lease, Lessor may collect from Lessee, and Lessee shall pay on demand to Lessor, all costs (including attorney's fees) necessary for repossession of the Helicopter, and an amount equal to all remaining lease payments and other amounts Lessee is liable for hereunder at any time, as liquidated damages for loss of bargain and not as a penalty.

(b)     <u>Repossession and other rights</u>.  Upon the occurrence of any Event of Default, Lessor and their representatives and agents:

(i)     to the extent permitted by Law shall:

(A)     have the right to enter upon any premises where Lessor reasonably believes the Helicopter, the Airframe, the Engine, any Part or the Helicopter Documents to be located, including any premises owned by Lessee or under Lessee's control, and take immediate possession of and, at Lessor's sole option, remove the same (and any engine or part which is not the Engine or a Part but which is installed on the Airframe, subject to the rights of the owner, lessor or secured Person thereof) with or without any judicial proceedings to the extent allowable in the jurisdiction where the Helicopter is located at the time; and/or

(B)     store the Helicopter, the Airframe, the Engine, any Part, or the Helicopter Documents at any premises where Lessee has a right to store such property (whether owned or leased by Lessee from a third party), with no rent due and no charges of any kind payable by Lessor, and for such length of time as Lessor may choose; and/or

(C)     not be liable, in conversion or otherwise, for the taking of any personal property of Lessee or any other Person which is in or attached to the Helicopter, the Airframe, an Engine or Part or included among the Helicopter Documents which is or are repossessed; <u>provided</u>, <u>however</u>, that Lessor shall return to Lessee or such other Person at Lessee's expense all such personal property belonging to Lessee or such other Person in a condition in which it was so taken from Lessee or such other Person; and/or

(D)     not be liable or responsible, in any manner, for any inadvertent

32

damage or injury to any of Lessee's property in repossessing and holding the Helicopter, the Airframe, the Engine, any Part or the Helicopter Documents, except for that caused by or in connection with Lessor's intentional or willful misconduct; and/or

(ii)    (if the Event of Default occurs before Delivery), may by notice to Lessee terminate Lessor's obligation to lease the Helicopter to Lessee hereunder; and/or

(iii)    may proceed by appropriate court action to enforce performance by Lessee of the applicable covenants and provisions of this Lease or the other Transaction Documents or to recover damages for the breach thereof; and/or

(iv)    may treat the Event of Default as a repudiation of this Lease by Lessee and/or by notice to Lessee, (i) require the grounding of the Helicopter and/or (ii) terminate the leasing of the Helicopter pursuant to, or terminate the leasing of the Helicopter hereunder on and as of the date specified in such notice, without prejudice to Lessee's continuing obligations hereunder; and/or

(v)    may do anything that may be required to cure the Event of Default (notwithstanding Lessor having no obligation or responsibility to do so and without prejudice to Lessor's right to treat any such non-compliance by Lessee as an Event of Default under this Lease) and recover from Lessee all costs and expenses incurred in doing so; and/or

(vi)    with or without taking possession thereof, be entitled to sell the Helicopter or any Part thereof at public or private sale, with or without advertisement, for cash or upon credit, or otherwise dispose of, hold, use, operate, lease to others or keep idle the Helicopter or any Part as Lessor in its sole discretion may determine appropriate, all free and clear of any rights of Lessee and without any duty to account to Lessee with respect to such action or inaction or for any proceeds thereof, all in such manner and on such terms as Lessor considers reasonably appropriate in its good faith exercise of discretion, as if this Lease had never been entered into; and/or

(vii)    be entitled to require Lessee to pay to Lessor all amounts due and payable by Lessee to Lessor and/or any Indemnitee under the Transaction Documents to which it is a party as of the date of termination or cancellation of the leasing of the Helicopter hereunder; and/or

(viii)    may require Lessee to redeliver possession of the Helicopter to Lessor at the Return Location (or such other location as Lessor may require) and in the condition required by Section 15 as if the Redelivery Date had occurred; and/or

(ix)    may deregister any international interest or other interests registered with the International Registry created pursuant to this Lease; and/or

(x)    may exercise the rights and remedies referred to in Section 13.2(f) of this Lease but so that if any provision of this Lease conflicts any term of the Cape Town Convention which is not mandatory, the provisions of this Lease shall prevail.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

(c)     <u>Assembly</u>.  Upon the occurrence of any Event of Default, which is continuing, if required by Lessor, Lessee shall make the Helicopter, the Airframe, the Engine, any Part, and the Aircraft Documents available at a place designated by Lessor for inspection and redelivery.

(d)     <u>Non-exclusive Remedies</u>.  No remedy referred to in this Section 13.2 is intended to be exclusive, but, to the extent permissible hereunder or under applicable Law, each shall be cumulative and in addition to any other remedy referred to above or otherwise available to Lessor at Law or in equity and the exercising or beginning of exercise by Lessor of any one or more of such remedies shall not preclude the simultaneous or later exercise by Lessor of any or all of such other remedies.  No express or implied waiver by Lessor of any Default or Event of Default shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default.  To the extent permitted by applicable Law, Lessee hereby waives any rights now or hereafter conferred by statute or otherwise that may require Lessor to sell, lease or otherwise use the Helicopter or the Engine which may otherwise limit or modify any of Lessor's rights or remedies hereunder.

(e)     <u>Power of Attorney</u>.  Lessee hereby irrevocably appoints Lessor as Lessee's agents and attorneys-in-fact to execute all documents deemed by Lessor to be necessary or desirable to release, terminate and void Lessee's interest in the Helicopter, and to file said documents for recordation with the FAA and any other appropriate Governmental Authority.  Lessor agrees that it will not exercise its right as attorney-in-fact and agent under this Section 13.2(e) unless an Event of Default has occurred and is continuing.

(f)     <u>Cape Town Convention remedies</u>. Without prejudice to the remedies available to Lessor hereunder or otherwise under applicable Law, Lessee and Lessor hereby agree that, to the extent applicable:

       (i)     Lessor may apply any and all remedies available to lessors under the Cape Town Convention, if any (including, without limitation, (i) the remedies provided under Article IX of the Aircraft Protocol and (ii) obtaining from a court speedy relief in the form of any one or more orders provided under the Cape Town Convention);

       (ii)     Article 13(2) of the Cape Town Convention shall not apply to this Lease; and

       (iii)     Lessor may exercise the rights and remedies referred to in Section 13.2(f) of this Lease but so that if any provision of this Lease conflicts with any term of the Cape Town Convention which is not mandatory, the provisions of this Lease shall prevail.

## 14.  PAYMENTS ON EVENT OF DEFAULT.

14.1    **Past Due Payments**. If any payment due to Lessor or any other Person under this Lease or any Transaction Document is not paid on the due date or if Lessor makes any payment on behalf of Lessee in accordance with the terms of this Lease, Lessee shall, without prejudice to Lessor's other rights and remedies, pay on demand interest thereon at the Overdue Rate from and including such date or the date of payment by Lessor to any person to the date of actual payment or reimbursement. Such interest shall accrue on a daily basis and be compounded monthly.

14.2    **Default Indemnity**. In addition to and without prejudice to other indemnity obligations of Lessee under this Lease, if an Event of Default occurs, or the Helicopter is not delivered on the proposed Delivery Date by reason of failure of Lessee to satisfy any conditions to that delivery, Lessee will

34

be fully responsible and will indemnify the Indemnitees on demand against any Loss sustained or incurred directly or indirectly as a result of such Event of Default or non-delivery.

## 15.    REDELIVERY.

15.1    **Redelivery**.  On the Redelivery Date, Lessee, at its sole cost and expense, shall redeliver the Helicopter and the Aircraft Documents to Lessor at the Return Location, and Lessor shall, subject to Section 15.4 of this Lease, accept redelivery of the Helicopter by execution and delivery to Lessee of the Redelivery Certificate; provided, however, that if Lessor determines in its reasonable exercise of discretion (and whether before or after the execution of the Redelivery Certificate) that the Helicopter is not in the condition required by this Section 15, the Lease Term shall automatically be extended and/or reinstated, as applicable, and Lessee shall continue to be bound by its covenants and obligations under this Lease, including the obligation to pay Total Rent (including the Annual Flight Hour Minimum) and any other amounts payable by Lessee under this Lease and to maintain, operate and insure the Helicopter in accordance with terms of this Lease. In the event that Lessor determines that the Helicopter is not in the required condition, and if Lessee disagrees with Lessor's determination, then the dispute shall be decided by a third-party maintenance and repair facility that will be selected by Lessor.  The decision of said facility with regard to whether the Helicopter is in the required condition shall be binding on the parties for all respects.  Costs of the third-party maintenance facility shall be paid by Lessee, and shall be prepaid by Lessee if required by said facility.

Lessee shall be responsible for any and all costs and expenses related to the return of the Helicopter, including but not limited to disassembly, crating, packaging, transportation, ferry costs, and legal costs, and shall also pay Lessor for any and all repairs, works, maintenance or modifications needed to place the Helicopter in the condition set forth in Section 15 of this Lease.

15.2    **Condition of Helicopter and the Aircraft Documents**.  On redelivery of the Helicopter and the Aircraft Documents the Helicopter shall be in the following condition, at a minimum:

(a)    the Helicopter shall be in such condition and all modifications and maintenance shall have been performed, and the Aircraft Documents shall be compiled and shall have been maintained, in such a manner as to demonstrate that Lessee has in all respects complied with its obligations contained in this Lease;

(b)    the Helicopter shall be free and clear of all Liens (other than Lessor's Liens);

(c)    all windows and glass shall be free of cracks, and all interior trim and exterior paint shall be free of damage, normal wear and tear excepted;

(d)    the livery of the Helicopter shall be the same as at Delivery and all markings or logos that may have been placed on the Helicopter shall have been removed and any removal damage repaired;

(e)    the Helicopter must have had an annual inspection (or the equivalent) within the previous sixty (60) days, performed by an Approved Maintenance Provider, and any discrepancies found therein must have been corrected;

(f)    the Engine must be producing their full rated power, and the main and tail rotor vibration levels shall be equal to, or lower than, the minimum acceptable limits as dictated by the Manufacturer;

35

(g)     the Helicopter and the Aircraft Documents shall be in such condition as qualifies the Helicopter, without any restriction, for immediate issuance of a standard transport category certificate of airworthiness by the FAA (or such other airworthiness certificate as Lessor may direct, in the event that Lessor decides to operate or lease the Helicopter elsewhere); and

(h)     the other return conditions, if any, set forth in Appendix 3.

15.3   **Inspections**.  Prior to termination or expiration of this Lease, representatives of Lessor and Lessee shall perform a joint inspection and maintenance flight of the Helicopter in order to identify repairs or other work which may be performed prior to redelivery to Lessor. The parties agree that this inspection shall not constitute acceptance of the Helicopter by Lessor.

15.4   **Correction and Additional Work**.  Lessee will correct all discrepancies and contamination found during any of the inspections, tests or flights described in Section 15.3 that are not in compliance with the Maintenance Program or the requirements of this Lease including the re-accomplishing of such tasks as may be necessary to conform all Aircraft Documents (other than those noted as deficient in the Acceptance Certificate) to the requirements of this Section 15.4 and provide to Lessor satisfactory evidence of such corrections.

## 16.   INDEMNITIES AND TAXES.

16.1   **General Operational Indemnities**.

(a)     <u>Indemnities</u>.  With effect from Delivery, Lessee agrees to indemnify and hold harmless each Indemnitee from and against and to pay on such Indemnitee's first demand all Losses suffered or incurred by such Indemnitee:

      (i)     relating to, or arising directly or indirectly in any manner or for any cause or reason whatsoever out of the Helicopter, the Airframe, the Engine or engine installed on the Helicopter, any Part, any Aircraft Documentation, including without limitation the delivery of the Helicopter by Lessor to Lessee hereunder, the capacity, age, airworthiness, value, durability, description, specific configuration, design, workmanship, materials, manufacture, construction, testing, delivery, ownership, registration, possession, control, use, operation, leasing, sub-leasing, insurance, maintenance, repair, refurbishment, condition (whether of the Helicopter, the Engine, any Part or the Aircraft Documentation), performance, fitness for any particular use or purpose or suitability of the Helicopter or any part thereof, service, overhaul, modification, change, alteration, loss, damage, removal, storage or re-delivery of, in or to the Helicopter or the Insurances, or otherwise in connection with the Helicopter, or relating to loss or destruction of or damage to any property, or death or injury of, or other loss of whatsoever nature suffered by, any person caused by, relating to, or arising from or out of (in each case whether directly or indirectly and whether arising on or prior to the date hereof) any of the foregoing matters; or

      (ii)     which may at any time be made or brought on the ground of latent or other defects or deficiencies therein, whether or not discoverable, known, or unknown, apparent or concealed, exterior or interior; or

36

> (iii) which may at any time be incurred by such Indemnitee in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture, or detention of the Helicopter, or in securing the release of the Helicopter or in connection with and following any Total Loss.

(b) <u>Notice on Liability</u>.  Lessee shall promptly notify Lessor of any event, which occasions or could give rise to any such liability, loss, or damage, including any loss of or damage to the Helicopter.

16.2 **General Tax Indemnity**.  Lessee shall pay and discharge or cause to be paid or discharged, to the extent permitted by applicable Law (and shall, if requested by an Indemnitee, produce to that Indemnitee evidence of the payment and discharge thereof), and indemnify each Indemnitee and keep each Indemnitee fully indemnified at all times (on a full indemnity basis) from and against all Taxes payable by that Indemnitee at any time in respect of this Lease, any of the Transaction Documents, or the Helicopter, the Airframe, the Engine, or any Part or interest therein or in respect of any transaction contemplated by this Lease or any of Transaction Documents including the manufacture, ownership, possession, performance, transportation, storage, management, disposal, control, design, condition, testing, delivery, non-delivery, repair, service, refurbishment, modification, overhaul, replacement, inspection, insurance, reinsurance, lack of insurance, loss, damage, removal, delivery, redelivery, transport, leasing, subleasing, location, use, possession and operation, repair, return, storage, and maintenance of the Helicopter, the Airframe, the Engine, or any Part or interest therein, or the rentals, receipts, income or earnings arising from any of the foregoing.  Lessee shall pay all taxes, tariffs, duties and fees, and government penalties, including without limitation, sales, use, excise, value-added, withholding, stamp, excise, business, and property taxes, imposed by any governmental entity in connection with the Helicopter, the Airframe, the Engine or any Part, this Lease, and the Transaction Documents, provided that in no event shall Lessee be responsible for U.S. income taxes of Lessor.

16.3 **No Deductions or Withholdings**.  Lessee shall ensure that all payments to be made under this Lease, whether in respect of Total Rent, Flight Hour Deposit, Agreed Value, Security Deposit, interest, fees, indemnities, or any other item, shall be made in full without any deduction or withholding (whether in respect of set-off, counterclaim, duties, Taxes, charges or otherwise) unless such deduction or withholding is required by Law, in which event Lessee shall:

(a) ensure that any deduction or withholding by it does not exceed the minimum amount legally required;

(b) on the due date for such payment pay to the payee such additional amount as shall result in the net amount received by such payee being equal on to that amount which would have been received by such payee had no such deduction or withholding been made;

(c) pay to the applicable taxation or other authorities within the period provided for under applicable Law for payment without incurring any Tax penalties whatsoever the full amount of the deduction or withholding legally required to be paid by it (including, but without prejudice to the generality of the foregoing, the full amount of any deduction or withholding from any additional amount paid pursuant to this subsection); and

(a) furnish to such payee, within 30 days of payment of such Taxes by it either (i) an official receipt of the applicable taxation or other authorities for all amounts deducted or withheld as aforesaid or (ii) if such receipts are not issued by the taxation or other authorities concerned on payment to them of amounts so deducted or withheld, a certificate of

37

deduction or other evidence of the relevant deduction or withholding reasonably satisfactory to Lessor.

16.4    **Reports**.  Lessee will provide to each Indemnitee such information as may reasonably be requested by such Indemnitee to enable it to fulfill its Tax filings or other information reporting requirements with respect to the transactions contemplated by Transaction Documents.  Without limiting the preceding sentence, Lessee will notify Lessor as soon as possible if Lessee becomes aware of any Tax payable by Lessee herein by virtue of Lessee's possession, operation, storage, or other utilization of the Helicopter, and in any event in advance of the date such Tax is due.  If any property tax is payable related to the Helicopter, Lessee will advise Lessor accordingly and provide Lessor with proof that Lessee paid such tax directly to the applicable authority on or before the due date thereof.

16.5    **Continuation of Indemnities**.  The rights of each Indemnitee in respect of the indemnities contained in this Lease, including in this Section 16, shall continue in full force and effect in favor of each such Indemnitee (but always in accordance with the provisions of and subject to the limitations provided herein) notwithstanding the termination of this Lease, the other Transaction Documents and/or the leasing of the Helicopter hereunder for any reason whatsoever, and notwithstanding any cessation of business of such Indemnitee or Lessee, the dissolution of such Indemnitee or Lessee, any change in the constitution of such Indemnitee or Lessee, any transfer or assignment by an Indemnitee of its rights in the Helicopter or its interest hereunder.

## 17.    FURTHER PROVISIONS.

17.1    **Assignments; Release; Lessee Cooperation**.

(a)    <u>Assignments</u>.  The provisions of this Lease shall be binding upon and shall run to the benefit of the successors and assigns of the parties.  No assignment, transfer or charge may be made by Lessee of all or any of its rights in respect of the Helicopter or this Lease without the prior written consent of Lessor to be provided in Lessor's sole and absolute discretion.  Any such assignment without Lessor's consent shall be voidable at Lessor's sole election.  Lessor may, from time to time, and at its own expense, transfer the Helicopter and/or assign or transfer all or any part of its rights and obligations under this Lease and any other Transaction Document to any other Person.  Lessee shall be notified by Lessor of such assignment, but for avoidance of doubt it is agreed that Lessee shall not have any consent right thereto, it being agreed that Lessee hereby consents to any such assignment or transfer of Lessor and shall cooperate with Lessor in accordance with Section 17.1(c) below.

(b)    <u>Release</u>.  If an assignment or transfer involves the assumption by the assignee or transferee of any of Lessor's obligations under Transaction Documents, Lessor shall be released from all such obligations so assumed.

(c)    <u>Lessee Cooperation</u>.  Subject to mutual agreement between the parties as to schedule, Lessee shall, consistent with its operational requirements, make the Helicopter and the Aircraft Documents available for inspection by any potential assignee or transferee of Lessor, including any Finance Party; <u>provided</u>, <u>however</u>, that arrangements for such inspection are made through Lessor and that such potential assignee or transferee shall be accompanied by a representative of Lessor during such inspection.  Lessor shall reimburse Lessee's reasonable costs and expenses in making the Helicopter and Aircraft Documents available for inspection under this paragraph (c).  Lessee shall upon request from Lessor

38

and at the expense of Lessor cooperate in effecting any assignment or transfer referred to in paragraph (a) above and shall provide any replacement insurance certificates as required by Lessor and make any filings and execute any agreements or other instruments (including any consent, acknowledgment, or supplement or amendment to or novation of this Lease), which are reasonably requested by Lessor.

17.2    **Further Assurances**. Lessee agrees from time to time to promptly do and perform such other and further acts and promptly execute and deliver any and all such other instruments as may be required by Law or reasonably requested by Lessor to establish, maintain and protect the rights and remedies of Lessor and the Finance Parties under the Transaction Documents and to carry out and effect the intent and purpose of the Transaction Documents, including registrations on the International Registry.

17.3    **Rights Cumulative**. The rights of all parties under this Lease are cumulative, may be exercised as often as the relevant party considers appropriate and are in addition to its rights under the general Law.

17.4    **Waivers**. The rights of all parties against each other or in relation to the Helicopter (whether arising under this Lease or the general Law) shall not be capable of being waived or varied otherwise than by an express waiver or variation in writing. Any failure to exercise or any delay in exercising any rights hereunder shall not operate as a waiver or variation of that or any other right. Any defective or partial exercise of any rights hereunder shall not preclude any other or further exercise of that or any other such right. No act or course of conduct or negotiation on the part of such party or on its behalf shall in any way preclude it from exercising any such right or constitute a suspension or any variation of any such right.

17.5    **Amendments and Consents**. The provisions of this Lease shall not be varied otherwise than by an instrument in writing executed by or on behalf of Lessor and Lessee and no consent, approval or agreement by Lessor or Lessee hereunder shall be effective unless in writing.

17.6    **Counterparts**. This Lease may be executed in counterparts each of which will constitute one and the same document.

17.7    **Notices**. All notices required or contemplated under this Lease (i) shall be delivered personally or by registered or certified mail, return receipt requested, postage prepaid, facsimile transmission or e-mail, (ii) shall be deemed to have been received, subject as otherwise provided in this Lease, in the case of a facsimile, upon confirmation of safe receipt thereof, and in the case of a letter, when delivered personally or two (2) days after deposit with a recognized international courier service, and in the case of an e-mail, when the sender receives a read receipt from the addressee and (iii) shall be addressed to the parties as follows:

to Lessor at:

PHI Aviation, LLC
Address:        2001 SE Evangline Thruway, Lafayette LA 70508
Email:          jhinch@phihelico.com; cclark@phihelico.com; mroservice@phihelico.com
Attention:      Jamie Hinch and Cory Clark

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

with a copy (which shall not constitute notice) to:

Robert D. Van de Vuurst
Baker, Donelson, Bearman, Caldwell & Berkowitz PC
602 Sevier Street, Suite 300
Johnson City, TN 37604
rvandevuurst@bakerdonelson.com

to Lessee at:

New York Helicopter Charter Inc.
Address:        165 Western Rd, Kearny NJ 07032
Email:          mroth@newyorkhelicopter.com
Attention:      Mike Roth

Either party may change the address at which it will receive notice by giving, as provided in this Section 17.7, at least two (2) Business Days' notice.

17.8  **Severability**.  Any provision of this Lease prohibited by or unlawful or unenforceable under any applicable Law actually applied by any court of competent jurisdiction shall, to the extent required by such Law, be severed from this Lease and rendered ineffective so far as is possible without modifying the remaining provisions of this Lease.

17.9  **Lessor's Right to Remedy**.  If Lessee fails to comply with any provision of this Lease, Lessor may, without being in any way obliged to do so or responsible for so doing and without prejudice to its ability to treat such failure as an Event of Default, effect compliance on behalf of Lessee, whereupon Lessee shall indemnify Lessor (as appropriate) in respect of any reasonable amount thereby expended by Lessor, together with all reasonable and necessary costs and expenses (including legal costs) in connection therewith.

17.10  **Entire Agreement**.  The Transaction Documents constitute the entire agreement between the parties hereto in relation to the leasing of the Helicopter by Lessor to Lessee, and supersede all previous proposals, agreements, and other written and oral communications in relation thereto.

17.11  **Governing Law**.  THIS LEASE IS A CONTRACT EXECUTED, AND TO BE CONSTRUED UNDER, THE LAWS OF THE STATE OF NEW YORK INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, AND WILL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE LAWS OF ANOTHER JURISDICTION TO APPLY.

17.12  **Jurisdiction; Service of Process**.

(a)    Each party hereby irrevocably consents to the exclusive jurisdiction and venue over any and all disputes between the parties arising under this Lease in, and for such purpose each party hereby submits to the jurisdiction of, the United States District Court for the Southern District of New York sitting in The Borough of Manhattan and any New York state court sitting in the County of New York, New York, and all related appellate courts.

AMERICAS 120298584

4876-1549-8926v3
2960519-000177 04/15/2024

(b)    Each party agrees to waive any objection to the courts set forth in subpart (a) above, whether on the grounds of venue, or on the grounds that the forum is not appropriate or otherwise.  Nothing in this Section 17.13 limits the rights of Lessor to bring proceedings to the extent allowed by applicable law against the Lessee arising out of or in connection with this Lease (i) in any court of competent jurisdiction; or (ii) concurrently in more than one jurisdiction. The Lessee agrees that a judgment or order of any of the court set forth above in subpart (a) arising out of or in connection with this Lease is conclusive and binding on it and may be enforced against it in any jurisdiction.

(c)    THE PARTIES HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF OR RELATING TO THIS LEASE OR THE TRANSACTION DOCUMENTS.

17.13  **Waiver of Immunity**.  The Lessee, in favor of the Indemnitees, irrevocably and unconditionally:

(a)    agrees not to claim any immunity from proceedings brought against it in relation to the Transaction Documents and to ensure that no such claim is made on its behalf;

(b)    consents generally to the giving of any relief or the issue of any process in connection with those proceedings; and

(c)    waives all rights of immunity in respect of it or its assets.

17.14  **Confidentiality.**  Neither Lessor nor Lessee shall, without the other's prior written consent, communicate or disclose the terms of the Transaction Documents or any information or documents furnished pursuant to the Transaction Documents (except to the extent that the same are within the public domain) to any third party (other than any Finance Party, any prospective assignee, any material investor in Lessor or creditor in Lessor, the respective external legal advisers, auditors, insurance brokers or underwriters of Lessor, Lessee and such parties); provided, however, that disclosure will be permitted, to the extent (i) required by applicable Law, (ii) as required for enforcement by either party of its rights and remedies with respect to this Lease, (iii) in connection with Lessor's potential sale, financing, refinancing of or related to the Helicopter and/or transfer or assignment of the Helicopter,  or (iv) as required in connection with any filings with the FAA or to perfect any assignment of any assignable interest or security interest; provided, however, that in connection with Section 17.15(i) above, if Lessee is the disclosing party, Lessee will provide Lessor with prompt written notice of such disclosure so that Lessor may seek a protective order or other appropriate remedy, and Lessee will use reasonable efforts to assist Lessor in seeking a protective order or other remedy.

**[signature page follows]**

41

**IN WITNESS WHEREOF**, Lessor and Lessee have each caused this Lease to be duly executed and this Lease has been delivered by each of Lessee and Lessor on the date first above written.

**PHI AVIATION, LLC** as Lessor

By: _Scott McCarty_
DocuSigned by:
A45B26A12A01441...

Name: Scott McCarty

Title: CEO

**NEW YORK HELICOPTER CHARTER INC.** as Lessee

By: _Michael Roth_
DocuSigned by:
FEB87913D3C7414...

Name: Michael Roth

Title: CEO

APPENDIX 1

FORM OF ACCEPTANCE CERTIFICATE

To: **PHI Aviation, LLC**

DATE:_____

This Acceptance Certificate is delivered by NEW YORK HELICOPTER CHARTER INC. ("**Lessee**") to PHI AVIATION, LLC ("**Lessor**") pursuant to the Helicopter Lease Agreement dated _____ between Lessor and Lessee (the "**Lease**"). Capitalized terms used herein shall have the meaning given to such terms in the Lease unless otherwise indicated.

Lessee hereby confirms to Lessor that Lessee has at _____ local time on this ____ day of _____, 2024 being the Delivery Date, accepted the following, in accordance with the provisions of the Lease:

**One (1) Bell 407 helicopter with manufacturer's serial number 53114 and US registration mark N407MR as described below (the "Helicopter")**

| Type | MSN | Current Registration Mark | Engine | Engine Serial Number and Cycle |
|------|-----|---------------------------|--------|-------------------------------|
| Bell 407 | 53114 | N407MR | Rolls-Royce 250-C47B | CAE-847309 |
| All parts, components, furnishings, equipment, and accessories belonging to, installed in or appurtenant to such helicopter or engine, including but not limited to, air conditioning units and float systems. | | | | |

Aircraft Documents: Listed on the attached Exhibit A.

Lessee also confirms that this Acceptance Certificate constitutes full, final, and unconditional acceptance of the Helicopter as being in full compliance with all terms, covenants, and conditions of the Lease. Lessee furthermore stipulates and agrees that, for the purposes of the Lease, the Helicopter is accepted "as is, where is" and "with all faults" and in its opinion the Helicopter is fit for the uses permitted under the Lease, is in good, safe, serviceable and airworthy condition, that all systems and avionics are fully functional and operational, that all Airworthiness Directives and service bulletins have been complied with, that all logbooks listed above have been received by Lessee, and that any completion and configuration work has been performed to Lessee's complete satisfaction. Lessee hereby represents and warrants to Lessor as of the Delivery Date that the representations and warranties made by Lessee in Section 2 of the Lease and the representations and warranties made by Lessee contained in the other Transaction Documents are, by reference to the facts and circumstances existing today, true and accurate as if made on the date hereof.

Lessee confirms that no Default or Event of Default exist as of the date of this Acceptance Certificate.

This Acceptance Certificate constitutes full, final, and unconditional acceptance of the Helicopter as being in full compliance with all terms, covenants, and conditions of the Lease.

THIS ACCEPTANCE CERTIFICATE, AND ANY NON-CONTRACTUAL OBLIGATIONS CONNECTED WITH IT, ARE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, AND WILL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE LAWS OF ANOTHER JURISDICTION TO APPLY.

IN WITNESS WHEREOF, Lessee and Lessor have, by their duly authorized representative, executed this Acceptance Certificate on the date written above.

NEW YORK HELICOPTER CHARTER INC.

By: _____

Name: _____

Title: _____

PHI AVIATION, LLC

By: _____

Name: _____

Title: _____

EXHIBIT A TO APPENDIX 1

AIRCRAFT DOCUMENTS

4876-1549-8926v3

2960519-000177 04/15/2024

APPENDIX 2

FORM OF REDELIVERY CERTIFICATE


To:     **PHI Aviation, LLC**

DATE: _____

Helicopter Lease Agreement dated _____ (the "**Lease**") between New York Helicopter Charter Inc.  and PHI Aviation, LLC, relating to one (1) Bell 407 bearing Manufacturer's Serial Number 53114 (the "**Helicopter**")

Terms used in this Certificate bear the meanings given to such terms in the Lease.

Lessor confirms that as of _____ hours on _____, 2024 being the redelivery date at []:

(1)     the Helicopter and the Aircraft Documents were examined and duly accepted by Lessor to Lessor's full satisfaction in accordance with and subject to the provisions of the Lease; and

(2)     subject to the provisions of the Lease, it is hereby confirmed that the Helicopter and the Aircraft Documents are in a satisfactory redelivery condition in accordance with the Lease.


New York Helicopter Charter Inc.

By: _____

Name: _____

Title: _____


PHI AVIATION, LLC

By: _____

Name: _____

Title: _____

APPENDIX 3

I.  RETURN CONDITIONS

Upon return, the Helicopter shall have installed the Engine and Parts as was installed in the Helicopter at Delivery, and shall be airworthy and serviceable in all respects.

The Helicopter shall be fully compliant with the Lessee's approved Maintenance Program, the content of which shall incorporate the Manufacturers' scheduled maintenance requirements. Where the Lessee's approved Maintenance Program does not incorporate or differs from the Manufacturers' scheduled maintenance requirements, bridging maintenance shall be performed at the sole cost of Lessee in order to align the Helicopter to the Manufacturers' scheduled maintenance requirements.

All Aircraft Documents shall be complete and all certificates valid (including, but not limited to, certificate of airworthiness, certificate of registration, radio licence, weight & balance reports, noise certificate, etc.).

All Airworthiness Directives issued by FAA and mandatory service bulletins issued by the Manufacturers due prior to return shall have been properly accomplished. All Airworthiness Directives and Alert Service Bulletins issued prior to return but due within two (2) months post return will be accomplished in full and terminated by modification where such termination is optional. Any other mandatory requirements of the FAA shall also be fully complied with.

Any modification not issued by the Manufacturers and embodied on the Helicopter shall be approved and accepted by the FAA and shall be clearly recorded in the Aircraft Documents. Any modification not approved and accepted by the FAA shall be removed or de-modified in accordance with data approved by the FAA and at the sole cost of Lessee unless otherwise agreed by Lessor in Lessor's sole discretion. Any modification that negatively affects the Helicopter's value or re-marketability shall be removed or de-modified in accordance with data approved by the FAA and at the sole cost of Lessee.

All defects and damage shall be within Manufacturers' approved limitations or repaired if outside such limitations. Repairs to the Helicopter shall be permanent, performed in accordance with Manufacturers' approved data and shall not be subject to repetitive inspections unless otherwise agreed by Lessor in Lessor's sole discretion. All deferred defects, any "on-watch" or reduced inspection intervals caused by defects shall be permanently rectified. For the avoidance of doubt, defects (even those allowable for continued operation by the Manufacturers) which require on-going monitoring shall not be permitted.

The Helicopter shall be fully equipped for use in a standard configuration with the same number of passenger seats installed at delivery unless otherwise agreed by Lessor in Lessor's sole discretion.

Where there is a Manufacturer approved or recommended Spectrographic Oil Analysis Program ("SOAP"), or where Lessee has implemented its own SOAP, then no more than thirty (30) days prior to return, oil samples shall be taken from the Engine and transmissions to undergo SOAP checks and the results shall meet the relevant Manufacturers' requirements for normal continued operation, where the same exist. Any test results that require continual monitoring or further samples to be taken shall be investigated and rectified permanently in accordance with Manufacturers' approved data.

Prior to return, the Helicopter shall undergo a demonstration flight which follows an operational profile chosen by Lessor (the flight schedule of which shall be mutually agreed between Lessor and Lessee) by Lessee using appropriately qualified flight test personnel (meaning that such personnel have current experience and training commensurate with industry standards), for the purpose of demonstrating to Lessor or Lessor's representatives

the satisfactory operation of the Helicopter, its equipment and systems. The demonstration flight shall be performed at the sole cost of Lessee and any discrepancies or defects identified during the demonstration flight shall be rectified at the sole cost of Lessee.

The Engine shall undergo a maximum power assurance during the maintenance test flight in accordance with Manufacturer's approved data for the purpose of demonstrating to Lessor or Lessor's representatives that the Engine is capable of producing a positive power margin that is acceptable under the Manufacturer's specifications. If the Engine is not capable of producing the required power margin or is outside of the limitations of the Manufacturer's approved data, this shall be rectified at the sole cost of Lessee.

Engine trend data shall be provided by Lessee in order to demonstrate that the Engine does not exhibit trends of deteriorating engine health. If the Engine demonstrates a trend of accelerated deterioration of engine health, this shall be rectified at the sole cost of Lessee.

The Engine shall be subjected to a full gas path borescope inspection in accordance with the Manufacturer's approved data as performed by independent inspector acceptable to Lessor at Lessee's cost. Any defects identified during the inspections which are outside of the Manufacturer's approved limitations shall be rectified at Lessee's sole cost.

All flight management HUMS, and any other software or programs shall have the latest updates.

Fuel tanks shall be free of corrosion and contamination as demonstrated by inspection records and approved test results.

Windows shall meet the requirements of Manufacturers' approved data and shall be free of delamination, blemishes, crazing, scratches, or other defects that obscure vision and shall be properly sealed, subject to normal wear and tear.

Doors shall meet the requirements of Manufacturers' approved data and shall be free moving, correctly rigged and fitted with serviceable seals.

Dynamic components including rotor blades shall meet the requirements of Manufacturers' approved data and shall be serviceable and free of cracks.

Ceilings, sidewalls, and bulkhead panels shall meet the requirements of Manufacturers' approved data and shall be serviceable, clean, and free of cracks and stains, in each case, subject to Reasonable Wear.

All floor coverings and seat covers shall meet the requirements of Manufacturers' approved data and shall be serviceable, clean, and free of stains, holes, thread-bare areas, rips, and tears, in each case, subject to Reasonable Wear.

All seats, including seatbelts, shall meet the requirements of Manufacturers' approved data and shall be serviceable, free of rips and tears, in each case, subject to Reasonable Wear.

All interior furnishings shall meet fire resistance regulations of the FAA and shall be evidenced by accompanying certification.

All mandatory and Manufacturers' required markings, decals and placards shall be securely installed, legible and in English.

All safety and emergency equipment required to be carried for off-shore operation, if applicable, shall be installed and serviceable.

All avionics equipment must be fully serviceable. All electronic modules / displays must be fully functional in all test and operational modes and fully operational when integrated or coupled with other flight management systems as required. Any electronic equipment required to upload system software is also required to be maintained for operational readiness.

Baggage compartments shall meet the requirements of Manufacturers' approved data and the panels shall be free of cracks and breaks, subject to Reasonable Wear.

Landing gear bays and other areas of exposed structure shall be cleaned and protected with corrosion inhibiting compound as necessary.

The Helicopter shall be free from corrosion that is identifiable by normal or visual inspection or such corrosion shall be removed in accordance with Manufacturers' approved data.

The Helicopter shall be free of fluid and gas leaks.

The Helicopter shall be cleaned thoroughly internally and externally both technically and cosmetically.

All current and historical Aircraft Documents, certifications and a full and completely amended set of technical publications at latest revision status, relating to the Helicopter shall be returned, in the English language, with the Helicopter. All Aircraft Documents relating to any life limited parts or components on the Helicopter shall, as applicable, have full unbroken back-to-birth traceability and any Aircraft Documents relating to any overhaul time limited or service life limited parts or components shall, as applicable, have unbroken traceability to the last overhaul or replacement. Those Aircraft Documents listed in Section III of these Return Conditions shall be provided as a minimum.

The Helicopter should have all checks (as defined by the Manufacturer and as outlined by the Lessor) completed that are expected to be due, including (i) an annual inspection, (ii) the next 1,500 hour inspection, and (iii) if is due within the next 50 Flight Hours, to include all lesser inspections due within the next 50 Flight Hours as such inspections are defined or recommended by the Manufacturer. In no event shall the Helicopter have less than 50 Flight Hours remaining until the next relevant check at Redelivery.

II.  PARTS AND ENGINE

All on condition Parts and components should be serviceable and reflect the overall condition of the Helicopter. Where on condition Parts and/or components have been replaced during the period of the Lease, the replacement parts and components must be of an equivalent value, modification and software revision, utility, and condition as the on condition Parts and components replaced.

III.  AIRCRAFT DOCUMENTS AT REDELIVERY

For the avoidance of doubt, at Redelivery Lessee shall provide Lessor with the following Aircraft Documents as a minimum requirement:

1.  Copies of all FAA issued certificates, Certificate of Airworthiness, Certificate of Registration, Radio License, etc.

2.  Up-to-date, certified listings showing compliance / accomplishment status for ADs, ASBs, SBs, modifications, STCs and repairs.

3.  Up-to-date, certified listings of installed hard-time components, installed on-condition / condition-monitored components and installed avionics equipment.

4.  Up-to-date, certified flight times / utilization reports. Including the method used for calculating Engine and Airframe Cycles.

5.  Up-to-date certified maintenance program last done / next due list including cross references to Manufacturers' maintenance planning documents.

6.  Up-to-date, certified structural repair map or damage chart.

7.  Dirty fingerprint (evidence) files for all accomplished structural repairs, ADs, ASBs, SBs, modifications and STCs.

8.  Release certification for installed hard-time, on-condition, and condition-monitored components (originals where possible).

9.  Up-to-date, certified airframe, modification, and engine logbooks, including the engine module log cards.

10. Up-to-date, certified component log cards for all components that require such log cards.

11. All work orders, engineering orders, task cards and work packs suitably filed in chronological order.

12. All technical logbook pages suitably filed in chronological order.

13. Up-to date copy of the Lessee's Maintenance Program.

14. Weight and balance report.

15. Engine ground run, SOAP test and borescope inspection reports.

16. HUMS or equivalent system exceedance reports (reporting periods and parameters to be agreed).

17. Engine trend monitoring reports (reporting periods and parameters to be agreed).

18. Flight test reports.

19. Flight data recorder download reports.

20. Hydraulic fluid, transmission oil, and fuel analysis reports.

21. Non Incident / Accident Statements for the airframe and engine.

22. Certificates showing codes for ATC transponder, ELT etc.

23. Certified inventory itemizing all of the above, plus any additional records.

Any documents requiring certification for accuracy should be signed / stamped and dated by the appropriate authorized party.

APPENDIX 4

**FINANCIAL TERMS APPENDIX (CONFIDENTIAL)**

*(INTENTIONALLY OMITTED FROM FAA FILING COUNTERPART AS CONTAINING CONFIDENTIAL FINANCIAL INFORMATION)*

For purposes of this Agreement:

"**Annual Flight Hour Minimum**" means five hundred fifty (550) Flight Hours each year of the Lease Term.

"**Cycle Ratio**" means two and one half (2 ½) Cycles per Flight Hour.

"**Flight Hour Deposit**" means Forty-Five Thousand Dollars ($45,000 USD) payable by Lessee to Lessor pursuant to Section 7.2.

"**Flight Hour Rate**" means Nine Hundred Seventy Dollars ($970 USD) per Flight Hour, which increases by three percent (3%) on each anniversary of the Delivery Date

"**Lessor's Account**" means the account listed below or such other account as Lessor shall notify Lessee in writing:

> PNC Bank, N.A.
> Two Tower Center Boulevard, 17th Floor
> East Brunswick NJ 08816
>
> For ACH delivery:
> Bank Routing Number: **031207607**
> Account Number: **8026475596**
> Account Name: PHI AVIATION, LLC DBA PHI Inc.
> Commercial Checking
>
> For Wire Transfers:
> Bank Routing Number: **031207607**
> SWIFT Code: **PNCCUS33**
> Account Number: **8026475596**
> Account Name: PHI AVIATION, LLC DBA PHI Inc.

"**Material Part**" means a Part that has a value of Six Thousand Dollars ($6,000 USD) or more, as determined by Lessor (acting reasonably).

"**Overdue Rate**" means the rate of eighteen percent (18%) per annum.

"**Security Deposit**" means Twenty Five Thousand Dollars ($25,000 USD) payable by Lessee to Lessor pursuant to Section 7.

"**Up Front Closing Costs**" means Ten Thousand Dollars ($10,000 USD).

ACCEPTANCE CERTIFICATE

To: **PHI Aviation, LLC**

DATE: June 18, 2024

This Acceptance Certificate is delivered by NEW YORK HELICOPTER CHARTER INC. ("**Lessee**") to PHI AVIATION, LLC ("**Lessor**") pursuant to the Helicopter Lease Agreement dated April 17, 2024, between Lessor and Lessee (the "**Lease**"). Capitalized terms used herein shall have the meaning given to such terms in the Lease unless otherwise indicated.

Lessee hereby confirms to Lessor that Lessee has at    3:00 p.m.    local time on this 18th  day of        June        , 2024 being the Delivery Date, accepted the following, in accordance with the provisions of the Lease:

**One (1) Bell 407 helicopter with manufacturer's serial number 53114 and US registration mark N407MR as described below (the "Helicopter")**

| Type | MSN | Current Registration Mark | Engine | Engine Serial Number and Cycle |
|------|-----|---------------------------|--------|-------------------------------|
| Bell 407 | 53114 | N407MR | Rolls-Royce 250-C47B | CAE-847309 |
| All parts, components, furnishings, equipment, and accessories belonging to, installed in or appurtenant to such helicopter or engine, including but not limited to, air conditioning units and float systems. | | | | |

Aircraft Documents: Listed on the attached Exhibit A.

Lessee also confirms that this Acceptance Certificate constitutes full, final, and unconditional acceptance of the Helicopter as being in full compliance with all terms, covenants, and conditions of the Lease. Lessee furthermore stipulates and agrees that, for the purposes of the Lease, the Helicopter is accepted "as is, where is" and "with all faults" and in its opinion the Helicopter is fit for the uses permitted under the Lease, is in good, safe, serviceable and airworthy condition, that all systems and avionics are fully functional and operational, that all Airworthiness Directives and service bulletins have been complied with, that all logbooks listed above have been received by Lessee, and that any completion and configuration work has been performed to Lessee's complete satisfaction. Lessee hereby represents and warrants to Lessor as of the Delivery Date that the representations and warranties made by Lessee in Section **Error! Reference source not found.** of the Lease and the representations and warranties made by Lessee contained in the other Transaction Documents are, by reference to the facts and circumstances existing today, true and accurate as if made on the date hereof.

Lessee confirms that no Default or Event of Default exist as of the date of this Acceptance Certificate.

This Acceptance Certificate constitutes full, final, and unconditional acceptance of the Helicopter as being in full compliance with all terms, covenants, and conditions of the Lease.

THIS ACCEPTANCE CERTIFICATE, AND ANY NON-CONTRACTUAL OBLIGATIONS CONNECTED WITH IT, ARE GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, AND WILL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE LAWS OF ANOTHER JURISDICTION TO APPLY.

IN WITNESS WHEREOF, Lessee and Lessor have, by their duly authorized representative, executed this Acceptance Certificate on the date written above.

NEW YORK HELICOPTER CHARTER INC.

By: _____
    DocuSigned by:
    Michael Roth
    FEB87913D3C7414...

Name: Michael Roth

Title: CEO

PHI AVIATION, LLC

By: _____
    DocuSigned by:
    Scott McCarty
    A45B20A12A01441...

Name: Scott McCarty

Title: CEO

EXHIBIT A TO APPENDIX 1

AIRCRAFT DOCUMENTS

- Engine: CAE - 847309 – historical log cards

- Aircraft: 53114 – aircraft historical log cards

- AD listings

- Last inspections performed

- Compliance documentation – bulletins

# LESSEE CONSENT

April 17, 2024

From:      PNC Bank, National Association, as agent for the benefit of the certain lenders
           (the "**First Lien Lenders**") (in such capacity, the "**First Lien Agent**")

           PNC Bank, National Association, as agent for the benefit of certain lenders (the
           "**Second Lien Lenders**", and together with the First Lien Lenders, the "**Lenders**")
           (in such capacity, the "**Second Lien Agent**", and together with the First Lien
           Agent, each an "**Agent**" and together, the "**Agents**")

           PHI Aviation, LLC, as lessor (the "**Lessor**")

To:        New York Helicopter Charter Inc. the "**Lessee**")

Ladies and Gentlemen:

We refer to that certain Helicopter Lease Agreement dated April 17, 2024 (as may be amended,
modified or supplemented from time to time, the "**Lease**") between the Lessor and the Lessee
relating to one (1) Bell model 407 helicopter with manufacturer's serial number 53114 and
Unites States registration number N447PH (to be changed to N417MR), and Rolls Royce
model 250-C47B engine bearing manufacturer's serial number CAE-847309 (the "**Aircraft**").
Each capitalized term used but not defined in this Lessee Consent shall have the meaning
ascribed to such term in the Lease.

For good and valuable consideration, the receipt of which is hereby acknowledged, you and we
agree as follows:

## 1.    General

1.1    The Lessor hereby notifies the Lessee that (A) by a First Priority Aircraft Security
       Agreement, dated as of September 19, 2023 (as amended, modified or supplemented from
       time to time, the "**First Priority Security Agreement**"), between the Lessor and the First
       Lien Agent, the Lessor assigned to the First Lien Agent, as security, and granted the First
       Lien Agent a first priority security interest in, all of the Lessor's right, title and interest in
       and to, *inter alia,* (a) the Aircraft; (b) the Lease and all other agreements (including, but
       not limited to, subleases, management agreements, maintenance or services agreements,
       interchange agreements, charter agreements, pooling agreements, timeshare agreements,
       and any other similar agreements or arrangements) entered into in connection with, or
       relating to, the Lease (collectively, the "**Security Assignment Documents**"), (c) the
       Lessor's rights to receive, either directly or indirectly, from any party or person, rent or
       any payments or performance obligations due under the Lease and any Associated Rights
       and International Interests (and the right to discharge said in International Interests) created
       by or through such agreements(s); (d) any guarantees, indemnity rights, warranties
       (including manufacturer's warranties), purchase agreements, or bill of sale respecting the
       Aircraft; (e) any insurance covering the Aircraft; (f) all technical data, records, manuals,
       logs and similar documents relating to the Aircraft; and (g) any proceeds of any of the

foregoing items (a) through (g) relating to the Aircraft (collectively, the "**Collateral**"); and (B) by a Second Priority Aircraft Security Agreement, dated as of September 19, 2023 (as amended, modified or supplemented from time to time, the "**Second Priority Security Agreement**"), between the Lessor and the Second Lien Agent, the Lessor assigned to the Second Lien Agent, as security, and granted the Second Lien Agent a second priority security interest in, all of the Lessor's right, title and interest in and to the Collateral. Notwithstanding the foregoing assignment of the Lessor's right, title and interest in the Lease, the Lessor shall remain obligated to perform all of the obligations of the "Lessor" under the Lease.

1.2    The Lessor further notifies the Lessee that pursuant to that certain Intercreditor Agreement, dated as of September 19, 2023, among, *inter alios,* certain loan parties, the First Lien Agent and the Second Lien Agent (as amended, modified or supplemented from time to time, the "**Intercreditor Agreement**"), the First Lien Agent and the Second Lien Agent have established and clarified their respective rights and priorities in the Collateral and have agreed that the exercise of any such rights shall be subject to the terms and provisions of Intercreditor Agreement.   As used herein, "Controlling Lien Agent" shall mean whichever of the two Agents is entitled from time to time under the terms of the Intercreditor Agreement to send a Relevant Notice (as defined herein) to the Lessee.

1.3    If the Controlling Lien Agent delivers a written notice (a "**Relevant Notice**") to the Lessee, copying the Lessor, that an "Event of Default" (as defined in the First Priority Security Agreement or the Second Priority Security Agreement, as applicable) has occurred and is continuing, then the Lessee shall thereafter perform, observe and comply with all of the terms of the Lease and the other Security Assignment Documents for the benefit of the Controlling Lien Agent as if the Controlling Lien Agent were named in place of the Lessor in the Security Assignment Documents, and the Lessee is entitled and required thenceforth to disregard any instructions to the contrary that the Lessee might receive from the Lessor or from the other Agent. After the Controlling Lien Agent delivers any Relevant Notice, the Lessee shall not recognize the exercise by the Lessor of any of the rights and powers of the Lessor under the Security Assignment Documents unless and until requested to do so in writing by the Controlling Lien Agent.

1.4    Unless and until the Lessee receives a Relevant Notice from the Controlling Lien Agent, the Lessee shall be entitled to deal exclusively with, and to rely upon notices and other communications that it receives from the Lessor as "lessor" under the Lease or as owner of the Aircraft.

**2.    The Lease - Representations**

The Lessee represents and warrants that, on the date hereof, (i) the Lessee has the power to execute, deliver and perform its obligations under this Lessee Consent, and all necessary corporate, shareholder and other action has been taken to authorize the execution, delivery and performance of this Lessee Consent, and (ii) this Lessee Consent is the legal, valid and binding agreement of the Lessee, enforceable against the Lessee in accordance with its terms, except to the extent that such enforcement may be limited by moratorium,

insolvency, bankruptcy, reorganization and other similar laws of general application affecting the rights of creditors or by general principles of equity.

**3.    The Lease - Agreements**

3.1    Until such time as each of the First Lien Agent and the Second Lien Agent has notified the Lessee in writing that such Agent no longer has any interest in, to or under the Lease Agreement, the Lessee agrees:

(a)    to pay all monies that may be payable by the Lessee to the Lessor under the Lease (including, but not limited to, Rent, Agreed Value, Security Deposit and Supplemental Rent) directly to the following account:

Bank Name: PNC Bank, N.A., East Brunswick, NJ 08816
SWIFT #: PNCCUS33
ABA #: 031207607
A/C: PHI AVIATION, LLC
A/C #: 8026475596

(the "**Pledged Account**"); and

(b)    to name the First Lien Agent as the sole loss payee as its interest may appear in respect of the hull insurances and reinsurances maintained for the Aircraft under the Lease, (ii) to reflect the name of each Agent and each Lender, as additional insureds under the liability insurances and reinsurances maintained under the Lease, (iii) to name each of (1) the Revolving Credit, Term Loan and Security Agreement (Oil & Gas) dated as of September 19, 2023, among, *inter alios*, PHI Aviation, LLC, as a borrower and the other borrowers named therein, the other Guarantors from time to time party thereto, the First Lien Lenders from time to time party thereto and the First Lien Agent; (2) the Revolving Credit, Term Loan and Security Agreement (Healthcare) dated as of September 19, 2023, among, *inter alios*, PHI Health, LLC, as a borrower and the other borrowers named therein, the other Guarantors from time to time party thereto, the Second Lien Lenders from time to time party thereto and the Second Lien Agent; (3) the First Priority Aircraft Security Agreement, dated as of September 19, 2023, between the Lessor and the First Lien Agent; (4) the Second Priority Aircraft Security Agreement, dated as of September 19, 2023, between the Lessor and the Second Lien Agent; and (5) this Lessee Consent, as additional contracts to which the parties thereto shall be included as additional insureds until such contracts are terminated, (iv) to furnish to the Lessor the certificates of insurance reflecting such revisions (and the Lessor shall then furnish the same to the Agent) and (v) not to remove the First Lien Agent as loss payee or remove any Lender as additional insured under the insurance and reinsurance required to be maintained under Section 12 (*Insurances*) of the Lease without the written consent of the First Lien Agent.

**4.    Administrative Matters**

4.1    Notices to the Lessor shall be provided as follows:

3

PHI Aviation, LLC
2001 SE Evangline Thruway
Lafayette, LA 70508
Attention: Jamie Hinch, Cory Clark,
jhinch@phihelico.com, cclark@phihelico.com, mroservices@phihelico.com

4.2    Notices to either Agent shall be provided as follows:

200 Crescent Court, Suite 400
Dallas, Texas 75201
Attention: Relationship Manager (PHI Group)
Telephone: (214) 871-1268
Facsimile: (214) 871-2015

with a copy to:

PNC Bank, National Association
PNC Agency Services
PNC Firstside Center
500 First venue (Mailstop:
Pittsburgh, Pennsylenaia 15219
Attention: Lori Killmeyer
Telephone: (412) 807-7002
Facsimile: (412) 762-8672

with an additional copy to:

Holland & Knight LLP
One Arts Plaza
1722 Routh Street
Suite 1500
Dallas, TX 75201
Attention: Michelle W. Suarez
Telephone: (214) 964-9500
Facsimile: (214) 964-9501

## 5.    Prior Lessee Consent

5.1    Each of the Lessor, PNC Bank, National Association, as agent for the benefit of certain lenders, and Lessee hereby agrees, acknowledges and confirms that the Lessee Consent dated July 19, 2023 among the aforementioned parties has been terminated and shall be of no further force or effect as of the date hereof.

## 6.    Miscellaneous

6.1    This Lessee Consent and the authorizations and instructions contained in this Lessee Consent are irrevocable unless and until you receive written notice to the contrary from the

Agents. The Agents shall not be bound by, or have any liability for the performance of, any of Lessor's obligations under the Security Assignment Documents (whether taken by Lessor, any lease manager or any successor attorney-in-fact and manager) unless expressly agreed to in this Lessee Consent or otherwise in writing by the applicable Agent following the exercise by such Agent of remedies under the Security Assignment Documents.

6.2     This Lessee Consent is for the benefit of the Agents on behalf of the Lenders, who in such capacity are each a third party beneficiary hereof, entitled to enforce the terms of this letter agreement to the same extent as if it were a party hereto and the terms of this sentence shall not be amended or otherwise modified without the consent of the Agents. Without prejudice to the Lessee's rights contained in the Lease, which shall not be adversely affected or modified by the provisions of this Lessee Consent, each Agent shall not be bound by, nor have any liability for the performance of, any of the Lessor's obligations under the Security Assignment Documents unless expressly agreed to in writing by the applicable Agent.

6.3     THIS LESSEE CONSENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, AND WILL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE LAWS OF ANOTHER JURISDICTION TO APPLY.

6.4     The provisions of Section [Jurisdiction and Service of Process] of the Lease shall be applicable to this Lessee Consent as if set forth in this Lessee Consent _mutatis mutandis_.

6.5     This Lessee Consent may be executed in any number of counterparts and on separate counterparts, each of which when executed shall constitute an original, but all counterparts shall together constitute one and the same instrument.

Please acknowledge your acceptance of and agreement to the terms of this Lessee Consent by signing where indicated below.

Very truly yours,

**PHI AVIATION, LLC**, as Lessor

By:_____
    Name: Scott McCarty
    Title: CEO


**PNC BANK, NATIONAL ASSOCIATION**
as First Lien Agent

By:_____
    Name:
    Title:


**PNC BANK, NATIONAL ASSOCIATION**
as Second Lien Agent

By:_____
    Name:
    Title:

**ACCEPTED AND AGREED**
this 17th day of April, 2024


**NEW YORK HELICOPTER CHARTER INC.**, as Lessee

By:_____
       Name: Michael Roth
       Title: CEO